William Scott HOLDERNESS, Appellant,

v.

STATE FARM FIRE AND CASUALTY COMPANY and State Farm Mutual Automobile Insurance Company, Appellees.

No. S–8939.

Supreme Court of Alaska.

June 22, 2001.

---

63. *See* Alaska Bar R. 62.

64. *See* Alaska Bar Rule 62.

David Karl Gross, Law Offices of Murphy L. Clark, Anchorage, for Appellant.

James M. Powell, Kimberlee A. Colbo, and Ronald H. Bussey, Hughes Thorsness Powell Huddleston & Bauman, LLC, Anchorage, for Appellees.

Before MATTHEWS, Chief Justice, EASTAUGH, FABE, BRYNER, and CARPENETI, Justices.

## OPINION

BRYNER, Justice.

## I. INTRODUCTION

Dr. William Holderness's car was struck from behind while he was driving from home to the hospital to perform surgery. He was severely injured and ultimately sued his insurers (collectively State Farm). This appeal, from an order partially dismissing Holderness's suit, raises two central questions. The first is whether Holderness's personal umbrella liability policy qualifies as automobile liability insurance under Alaska's insurance code. If so, our precedent requires that the policy's underinsured motorist coverage include prejudgment interest and attorney's fees. We conclude that the umbrella policy is automobile liability insurance. The second question is whether the accident was covered by the general liability policy of Alaska Podiatry Associates, a medical corporation of which Holderness was an executive officer. We conclude that the accident was not covered by the general liability policy because Holderness's duties as an executive officer of Alaska Podiatry Associates did not include commuting to work.

## II. *FACTS AND PROCEEDINGS*

While Holderness was driving to Anchorage to perform surgery on January 20, 1994, another motorist hit his car from behind, causing him serious and permanent injuries. The driver who hit Holderness was underinsured.

At the time of the accident, Holderness held two State Farm insurance policies: a personal automobile liability policy covering the car he was driving and a personal liability umbrella policy. In addition, Holderness's medical corporation, Alaska Podiatry Associates, owned a State Farm business insurance policy that covered Holderness with respect to his duties as one of its executive officers.

Holderness filed suit against State Farm, seeking more than $5,000,000 in damages on a variety of claims, most sounding in insurance bad faith. State Farm paid Holderness the facial limits on his auto and umbrella policies, $100,000 and $2,000,000. Soon thereafter, this court decided *State Farm Mutual Auto Insurance Co. v. Harrington.*[1] There, we interpreted AS 21.89.020, a provision of Alaska's insurance code, to require that, in the absence of a waiver by the insured, an automobile insurance policy must be deemed to provide equal liability and underinsured motorist coverage, including coverage for attorney's fees and prejudgment interest above the policy's facial limits.[2]

In response to this court's ruling in *Harrington,* State Farm paid Holderness an additional $28,555.52, representing prejudgment interest and attorney's fees under his auto policy's underinsured motorist coverage. State Farm did not pay interest and attorney's fees under the umbrella policy, maintaining that *Harrington* did not apply to such policies. The company also declined to pay Holderness anything under the Alaska Podiatry Associates business liability policy, claiming that it did not cover the accident.

After considering argument concerning whether *Harrington* applied to umbrella policies and whether the Alaska Podiatry Associates business liability policy covered Holderness's accident, the superior court issued a ruling that the umbrella policy did not qualify as automobile liability insurance under Alaska's insurance code and that State Farm therefore owed Holderness no prejudgment interest or attorney's fees beyond that policy's $2,000,000 facial limit. The court further ruled that, although the Alaska Podiatry Associates policy qualified as liability insurance under *Harrington* (and therefore would have to be construed to provide equal liability and underinsured motorist coverage), the policy did not cover Holderness's accident because he was not performing "executive duties" when the accident occurred. Based on these rulings, the superior court dismissed those portions of Holderness's suit that sought recovery under the umbrella and business liability policies.

Meanwhile, an arbitration panel found that Holderness had suffered damages totaling $7,308,076 in the accident. Holderness moved to confirm the panel's award and sought Alaska Civil Rule 82 attorney's fees based on that amount. State Farm opposed this motion, seeking to reduce the panel's damages finding to $2,128,555.52—the amount that State Farm had already paid Holderness, and the amount that State Farm claimed to be the total of the policy limits for his auto and umbrella insurance. The superior court confirmed the arbitration panel's award, denying Holderness's request for Rule 82 attorney's fees and declining State Farm's request to cap the award at State Farm's estimate of policy limits.

Holderness then requested entry of partial judgment under Alaska Civil Rule 54(b). In response to this request, the superior court entered a partial judgment that dismissed Holderness's "contract claims" with prejudice. Holderness appeals.

## III. *DISCUSSION*

### A. *Standard of Review*

We apply our independent judgment to issues of statutory construction[3] and

---

**1.** 918 P.2d 1022 (Alaska 1996).

**2.** *See id.* at 1025–27.

**3.** *See Tipton v. ARCO Alaska, Inc.,* 922 P.2d 910, 912 n. 1 (Alaska 1996).

contract interpretation.[4] When interpreting insurance contracts we look to four factors: (1) the language of the disputed policy provisions; (2) the language of other provisions in the policy; (3) relevant extrinsic evidence; and (4) case law interpreting similar provisions.[5] We review a superior court's decision on attorney's fees for an abuse of discretion.[6]

### B. *Harrington Reformation of the Umbrella Policy*

 State Farm paid Holderness the $2,000,000 facial limit of his personal liability umbrella policy, but refused to pay him prejudgment interest and Civil Rule 82 attorney's fees in excess of that amount. Holderness argued below that his umbrella policy qualified as automobile insurance under AS 21.89.020 and triggered reformation of the policy to include prejudgment interest and attorney's fees under *Harrington.* The superior court disagreed, ruling that umbrella policies are not automobile insurance under AS 21.89.020 and, accordingly, that *Harrington* does not apply.

Alaska Statute 21.89.020(c) requires insurers to offer underinsured motorist coverage in amounts equal to the limits purchased for liability coverage. The statute provides, in relevant part:

> An insurance company offering automobile liability insurance in this state for bodily injury or death shall, initially and at each renewal, offer coverage prescribed in AS 28.20.440 and 28.20.445 or AS 28.22 for the protection of the persons insured under the policy who are legally entitled to recover damages for bodily injury or death from owners or operators of uninsured or underinsured motor vehicles.... Coverage

required to be offered under this section must include the following options:

> (1) policy limits equal to the limits voluntarily purchased to cover the liability of the person insured for bodily injury or death[.] [7]

Our cases have interpreted this provision to mean that if an automobile liability policy fails to include equal liability and underinsured motorist coverage, the policy must be reformed to make the underinsured motorist coverage "equal to the limits voluntarily purchased" for liability.[8] In *Harrington,* we specifically considered whether a policy reformed to provide such underinsured motorist coverage must also include attorney's fees and prejudgment interest in addition to the policy's facial limits, as would be required in a case involving liability coverage.[9] We held that underinsured motorist coverage must include those additional amounts.[10] Noting that we had interpreted "policy limits" similarly in other contexts, we found this interpretation consistent with the underlying goal of AS 21.89.020(c): "to provide for the insured ... the same benefit level as that provided by the insured to those asserting claims against the insured." [11]

Here, we must decide whether *Harrington* applies to Holderness's umbrella policy. We based our decision in *Harrington* on AS 21.89.020(c), which, by its own terms, only applies to "automobile liability insurance." While subsection (c) of AS 21.89.020 does not define "automobile liability insurance," subsection (a) of the same provision sets forth a core definition, describing an automobile liability policy as one "that insures an owner or operator of a motor vehicle against loss resulting from liability for bodily injury or death, or for property injury or destruction,

---

**4.** *See Alaska Hous. Fin. Corp. v. Salvucci,* 950 P.2d 1116, 1119 (Alaska 1997).

**5.** *See Cox v. Progressive Cas. Ins. Co.,* 869 P.2d 467, 468 n. 1 (Alaska 1994).

**6.** *See Osborne v. Hurst,* 947 P.2d 1356, 1358 (Alaska 1997).

**7.** AS 21.89.020(c). Under subsection (e) of AS 21.89.020, an insured may waive underinsured motorist coverage required under subsection (c), but must do so in writing.

**8.** AS 21.89.020(c)(1); *see State Farm Mut. Auto. Ins. Co. v. Harrington,* 918 P.2d 1022, 1025 (Alaska 1996); *Burton v. State Farm Fire & Cas. Co.,* 796 P.2d 1361, 1364 (Alaska 1990).

**9.** *See Harrington,* 918 P.2d at 1025–26.

**10.** *See id.*

**11.** *Id.* at 1026.

or both." [12] Accordingly, we apply this definition in determining whether subsection (c)'s requirement of equal liability and underinsured motorist coverage applies to Holderness's umbrella policy.

Holderness's umbrella policy expressly covers losses arising from his liability for personal injury or property damage in excess of the limits covered by his underlying State Farm policies:

> If you are legally obligated to pay damages for a **loss,** we will pay your **net loss** minus the **retained limit.** Our payment will not exceed the amount shown on the **Declarations** as Policy Limits—Coverage L—Personal Liability.[13]

The umbrella policy defines a "loss" as "an accident that results in personal injury or property damage during the policy period." "Net loss" is the total of the damages the insured must pay for the loss and the reasonable expenses incurred in settling or trying the case. The "retained limit" is the amount the insured or the underlying insurance must pay before the umbrella policy begins to pay. The policy additionally covers "expenses we incur and costs taxed against you in suits we defend," including attorney's fees,[14] as well as "prejudgment interest awarded against you on that part of the judgment we pay under Coverage L."

Although the umbrella policy might have been phrased to exclude coverage for liability stemming from the ownership or operation of an automobile, it was not. By contrast, it specifically excludes coverage "for any loss involving your maintenance, use, handling or ownership of any aircraft." This language persuades us that the umbrella policy falls within the ambit of AS 21.89.020(a) and (c),

because the policy insures Holderness as "an owner or operator of a motor vehicle against loss resulting from liability for bodily injury or death, or for property injury or destruction, or both." [15]

Indeed, State Farm acknowledges that Holderness's umbrella policy might qualify as "an automobile liability policy" under the literal terms of AS 21.89.020; but State Farm insists that this insurance code provision incorporates by reference a traffic code provision, AS 28.22.121(b), that precludes umbrella policies from being treated as automobile liability insurance. State Farm's argument unfolds as follows.

Subsection (c) of AS 21.89.020—the insurance code provision that requires equal liability and underinsured motorist coverage—specifically refers to, and directs insurers offering automobile liability coverage to comply with, two separate parts of the motor vehicle code, the Alaska Mandatory Automobile Insurance Act (AMAIA) [16] and the Motor Vehicle Safety Responsibility Act (MVSRA): [17] "An insurance company offering automobile liability insurance in this state ... shall ... offer coverage prescribed in AS 28.20.440 and 28.20.445 [of the MVSRA] or AS 28.22 [of the AMAIA] for the protection of the persons insured under the policy who are legally entitled to recover damages" caused by an uninsured or underinsured motorist.[18]

State Farm points out that one of the incorporated AMAIA provisions, AS 28.22.121(b), expressly excludes umbrella policies from its definition of motor vehicle liability policies: "A policy is excluded from the application of this chapter if the automobile

---

12. AS 21.89.020(a) provides:
 An automobile liability policy that insures an owner or operator of a motor vehicle against loss resulting from liability for bodily injury or death, or for property injury or destruction, or both, that is sold in the state, must contain limits in at least the amount prescribed for a motor vehicle liability policy in AS 28.20.440 or AS 28.22.101.

13. The emphases in the quoted passage appear in the original policy, which emphasizes words to indicate that they are specifically defined in the policy. In the remaining references, this emphasis is omitted, except where necessary for clarity.

14. *Cf. Kenai Peninsula Borough v. Port Graham Corp.,* 871 P.2d 1135, 1141 (Alaska 1994); *Schultz v. Travelers Indem. Co.,* 754 P.2d 265, 267 (Alaska 1988).

15. AS 21.89.020(a).

16. AS 28.22.

17. AS 28.20.

18. AS 21.89.020(c).

or motor vehicle liability coverage is provided only on an excess or umbrella basis."[19] In State Farm's view, because this AMAIA exclusion is incorporated in AS 21.89.020(c), this subsection necessarily excludes umbrella policies from its requirement of equal liability and underinsured motorist coverage. Thus, State Farm insists, it is impossible to apply AS 21.89.020(c) to umbrella policies without "nullifying" AS 28.22.121(b).

The superior court found this argument persuasive, concluding "that the exclusion of umbrella policies from the requirements of AS 21.89.020, governing what an insurer must offer in a policy, is necessary to give effect to the Legislature's intention to exclude umbrella policies from AS 28.22, governing what an insured must obtain in a policy." But closer examination of these provisions reveals no actual conflict between the insurance code's treatment of umbrella policies as automobile liability insurance and the AMAIA's exclusion of such policies from its own requirements.

The provisions of the insurance code and the AMAIA dealing with automobile insurance are counterparts, each dealing with the same subject but addressing different parties. The motor vehicle code's AMAIA requires drivers to buy certain minimum liability and underinsured motorist coverages,[20] whereas the insurance code's AS 21.89.020 requires insurance companies to offer drivers certain minimum levels and combinations of these coverages. Considered from the point of view of the parties affected by each of these statutory regimes, any potential conflict between the insurance code's AS 21.89.020 and the AMAIA's AS 28.22.121(b) is more apparent than real.

Since the AMAIA's function is to set minimum levels of coverage that drivers must buy and to specify what provisions these mandatory policies must contain, the act's exemption of umbrella policies simply enables drivers to buy excess or umbrella policies that do not duplicate various provisions that the AMAIA already requires to be included in their underlying mandatory coverage.[21] In keeping with the AMAIA's relatively narrow focus, that act's exemption for umbrella policies operates only within the sphere of the AMAIA itself; AS 28.22.121(b) thus provides that "[a] policy is excluded *from the application of this chapter* [that is, from the AMAIA] if the ... coverage is provided only on an excess or umbrella basis."[22] By its own terms, then, this exemption does not reach beyond the AMAIA and so cannot nullify coverage that other statutory regimes independently require insurers to offer.

The insurance code's AS 21.89.020 imposes this kind of independent coverage requirement. Apart from prescribing general compliance with applicable provisions of the AMAIA, AS 21.89.020(c)(1) commands that underinsured motorist coverage offered under section .020 "include ... policy limits equal to the limits voluntarily purchased to cover ... liability." And as we have already indicated, AS 21.89.020(a) describes automobile liability broadly enough to include umbrella policies like the State Farm policy at issue here. Accordingly, the AMAIA's internal exemption for umbrella policies fails to reach these externally imposed coverage requirements of the insurance code.

**19.** AS 28.22.121(b). The full text of AS 28.22.121 reads:

*Excess of additional coverage.* (a) A policy that grants the coverage required for a motor vehicle liability policy may also grant lawful coverage in excess of or in addition to the coverage specified for a policy and the excess or additional coverage is not subject to the provisions of this chapter. With respect to a policy that grants excess or additional coverage, the term "motor vehicle liability policy" applies only to that part of the coverage that is required by this chapter.

(b) A policy is excluded from the application of this chapter if the automobile or motor

vehicle liability coverage is provided only on an excess or umbrella basis.

**20.** *See* AS 28.22.101.

**21.** For instance, AS 28.22.101(d) requires that motor vehicle liability policies governed by the AMAIA "must provide coverage in the United States or Canada." Under the exclusion for umbrella policies in AS 28.22.121(b), an insured might buy umbrella coverage for a more restricted geographical area.

**22.** AS 28.22.121(b) (emphasis added).

We find further support for this conclusion when we consider how the insurance code and the AMAIA interact with a third statutory regime, the MVSRA. We described this interaction in *Progressive Insurance Co. v. Simmons*.[23] We noted in *Simmons* that the "AMAIA's coverage limits generally parallel those of the MVSRA;" while these two acts "coexist as components of the Alaska Uniform Vehicle Code," they "are not coextensive."[24] Thus, we observed, the AMAIA "supplements, but does not supplant, the MVSRA."[25] Concerning the insurance code, we separately noted that the original version of AS 21.89.020 "required that all policies issued in the state meet the content requirements imposed by the MVSRA" and "expressly referred to subsection 28.20.440(b)(3) of the MVSRA, which required uninsured motor vehicle coverage."[26] We thus recognized that, "[a]lthough the MVSRA has never been a mandatory insurance law, as of 1968 the act's policy content requirements became mandatory for all policies written in the state."[27]

We further observed in *Simmons* that, upon enactment of the AMAIA in 1989, AS 21.89.020's language incorporating the content requirements of the MVSRA was amended to include a reference to the AMAIA.[28] Given that AS 21.89.020(c) now incorporates the content requirements of both the MVSRA and the AMAIA, which are generally parallel but not coextensive, we went on to ask, "How should this language be interpreted where the contents of policies required under the mandatory act differ from the content requirements of the MVSRA?"[29]

Answering this question, we interpreted AS 21.89.020(c) to demand primary compliance with the MVSRA unless the AMAIA imposes broader requirements:

> In our view, this language means that all policies in the state must continue to conform to the content requirements of the MVSRA, and that if the content requirements of the mandatory act are broader than those of the MVSRA, those requirements must also be complied with as to persons covered by the mandatory act.[30]

In the present case, the content requirements of the MVSRA and the AMAIA stand in conflict: the MVSRA contains no equivalent to the categorical exclusion of umbrella policies set out in the AMAIA's 28.22.121(b).[31] In this respect, the MVSRA provides for broader coverage than the AMAIA. Thus, under *Simmons*, even assuming that AS 21.89.020(c) did not independently mandate equal liability and underinsured motorist coverage, the subsection's incorporation of the MVSRA's comparable content requirements[32] would prevail over its incorporation of the AMAIA's umbrella policy exclusion.

For these reasons, we hold that the superior court erred in concluding that AS 28.22.121(b) excludes Holderness's umbrella policy from being treated as an automobile liability policy under AS 21.89.020(a) and from being reformed, under *Harrington*, to provide equal liability and underinsured motorist coverage, as prescribed by AS 21.89.020(c).

23. 953 P.2d 510, 520–22 (Alaska 1998).

24. *Id.* at 520–21.

25. *Id.* at 521.

26. *Id.* at 520.

27. *Id.*

28. *See id.* at 522. Specifically, we stated:
 Finally, prior to the mandatory insurance act of 1989, AS 21.89.020(c) read as follows:
 An insurance company offering automobile liability insurance in this state for bodily injury or death shall offer coverage prescribed in AS 28.20.440 and 28.20.445 ... for the protection of the persons insured under the policy who are legally entitled to recover damages for bodily injury or death from owners or operators of uninsured or underinsured motor vehicles.
 The mandatory act changed this by adding the phrase "or AS 28.22" after "28.20.445."

29. *Id.*

30. *Id.*

31. *Compare* AS 28.20.440(g) (MVSRA) *with* AS 28.22.121 (AMAIA).

32. *See* AS 28.20.440(b)(3) (requiring an owner's liability insurance policy to contain underinsured motorist coverage "in not less than the amounts" set out for liability coverage).

### C. Coverage Under the Alaska Podiatry Associates Business Liability Policy

■ At the time of the accident, Holderness was insured under a business liability policy held by Alaska Podiatry Associates for those acts he undertook "with respect to [his] duties as [an executive] officer[ ]." The liability section of the policy covers "those sums that the insured becomes legally obligated to pay as damages because of bodily injury, property damage, personal injury or advertising injury to which this insurance applies." Although the "Business Liability Exclusions" section of the policy specifically excludes coverage for injuries arising out of an insured's use of an automobile, the same section states an exception to this exclusion that results in coverage for liability arising from use of a non-company-owned auto:

> Under [the liability coverage], this insurance does not apply:
>
> . . . .
>
> 7. to bodily injury or property damage arising out of the ownership, maintenance, use or entrustment to others of any aircraft, auto or watercraft owned or operated by or rented or loaned to any insured. Use includes operation and loading or unloading.
>
> This exclusion does not apply to:
>
> . . . .
>
> e. bodily injury or property damage arising out of the use of any non-owned auto in your business by any person other than you[.]

Like Holderness's umbrella policy, this business insurance is an "automobile liability policy" under AS 21.89.020(a) because its coverage includes circumstances in which liability arises for causing injury, death, or property damage by driving an automobile. Thus, as the superior court correctly recognized, if the provisions of the policy's liability coverage extend to Holderness's accident, then AS 21.89.020 and *Harrington* would require reformation of the policy to provide underinsured motorist coverage that parallels its liability coverage.

Accordingly, we must inquire whether the policy's liability coverage might extend to Holderness's accident. The policy defines "non-owned auto" to mean "any auto you do not own, lease, hire or borrow which is used in connection with your business." The policy also specifies that, throughout its provisions, " 'you' and 'your' refer to the Named Insured shown in the Declarations and any other person or organization qualifying as a Named Insured under this policy." The Named Insured in this case was Alaska Podiatry Associates. And since the policy nowhere indicates that another person or organization would qualify as a Named Insured, it follows that Holderness's personal automobile was a "non-owned" auto under the terms of the policy—that is, it was not an auto owned by Alaska Podiatry Associates, the only Named Insured.

■ The remaining question, then, is whether Holderness was an insured under the Alaska Podiatry Associates policy at the time of the accident; if he was an insured, his injuries would be covered by the policy. In describing who it insures, the policy distinguishes between the insured company's employees and its executive officers. Under the policy, the corporation's "employees, other than . . . executive officers," are insureds "only for acts within the scope of their employment." By contrast, the corporation's "executive officers . . . are insureds . . . only with respect to their duties as . . . officers." Accordingly, the executive officers of Alaska Podiatry Associates were covered for personal liability arising from their own negligence while carrying out their duties as executive officers.

It is undisputed that Holderness was an executive officer of Alaska Podiatry Associates. Holderness argues that driving from home to the hospital to perform surgery qualifies as conduct performed "with respect to" his duties as a corporate officer. Therefore, he claims, he was covered by the liability policy at the time of the accident, and the policy, when reformed under *Harrington,* insures him for the injuries he sustained at the hands of an underinsured motorist.

State Farm responds that because Holderness was not "attending a director's meeting or a shareholder's meeting[,] . . . signing payroll checks for the corporation's employ-

ees," or the like, he was not acting with respect to his duties as a corporate officer. But the non-managerial nature of Holderness's activity does not necessarily determine whether he was acting with respect to his duties. For in the absence of a policy provision more narrowly defining the policy's reference to duties of office, Holderness's duties as an executive officer of Alaska Podiatry Associates would have encompassed not just his managerial duties, but all duties related to the corporation's business that Holderness usually performed as an executive officer. Two cases illustrate this point.

In *Martin v. United States Fidelity & Guaranty Co.*,[33] the Supreme Court of Missouri, holding that a policy's use of the term "duties as your officers" was ambiguous, resolved the ambiguity by concluding that the term could include a non-managerial duty, such as fitting a pipe flange, if that duty was one of the executive officer's actual responsibilities.[34] By contrast, in *Creel v. Louisiana Pest Control Insurance, Inc.*,[35] the Court of Appeal of Louisiana construed similar policy language narrowly, to include only managerial duties; but the court based its decision on the trial testimony of Ray's Pest Control's president, who specifically described his responsibilities as president to be limited to "attending and participating in corporate meetings, the hiring and firing of personnel, handling financial dealings, and making corporate decisions."[36] Noting that Ray's president had been on his way to spray a house for pests when the accident occurred, the court concluded that he was not an insured at the time of the accident.[37]

Read together, *Martin* and *Creel* suggest that, absent a narrower definition of "duties of office," when a policy extends coverage to executive officers acting "with respect to their duties as . . . officers," the coverage should be construed to include all work-related activities performed by executive officers—whether menial or managerial—unless case-specific evidence establishes that an officer actually undertook to perform a narrower range of duties in that capacity.

Here, no record evidence suggests that Holderness's role as an executive officer of Alaska Podiatry Associates was actually limited to managerial or purely "executive" functions. Accordingly, we reject State Farm's contention that Holderness was necessarily acting outside the scope of his duties as an executive officer at the time of the accident merely because he was not performing managerial functions.

But this conclusion does not resolve the issue specifically presented here. The superior court's ruling did not focus on whether Holderness was performing uniquely "executive" functions at the time of the accident; instead, the ruling more broadly concluded that driving to work falls outside the scope of any kind of work-related activity: "Holderness has raised no factual issue that he was involved in anything other than a completely ordinary commute to work." As the court's ruling recognizes, Alaska follows the general rule that going to work and coming home fall outside the scope of employment.[38] Although the "going-and-coming" rule allows for exceptions on certain occasions—as when special errands call a worker away from work[39] or force the worker to take an unusually dangerous route to work[40]—the record presents no evidence suggesting that Holderness was responding to any unique or special demands when he left home for the hospital

---

33. 996 S.W.2d 506 (Mo.1999).

34. *Id.* at 508, 510.

35. 723 So.2d 440 (La.App.1998), *cert. granted*, 731 So.2d 272 (La.1998).

36. *Id.* at 443.

37. *See id.* at 443–44. Unlike the policy at issue here, however, the policy in *Creel* excluded coverage for officers performing executive duties; accordingly, the court's conclusion that the presi-

dent's conduct fell outside his official duties resulted in a finding that the Ray's Pest Control policy covered the Creels' injuries. *See id.* at 444.

38. *See, e.g., Seville v. Holland Am. Line Westours, Inc.*, 977 P.2d 103, 106 (Alaska 1999).

39. *See, e.g., Witmer v. Kellen*, 884 P.2d 662, 666 (Alaska 1994).

40. *See, e.g., Johnson v. Fairbanks Clinic*, 647 P.2d 592, 595 (Alaska 1982).

on the day of the accident.[41] Nor does the record contain any case-specific evidence indicating that Alaska Podiatry Associates actually considered commuting to work to be an integral aspect of Holderness's duties as an executive officer. Absent such evidence, we conclude, the superior court properly ruled that Holderness "was not performing his duties as an executive officer and was not covered by the [Alaska Podiatry Associates] policy."

### D. Dismissal of Contract Claims

This appeal is before us on a Civil Rule 54(b) partial judgment dismissing all of Holderness's "contract claims" with prejudice. Holderness argues that this judgment was too broad because it could be interpreted to block a contractual claim that he has asserted separately—his still pending claim that State Farm violated AS 21.89.020(e) by failing to obtain his written waiver of underinsured motorist coverage.

But the superior court's partial summary judgment dismissed Holderness's contract claims "in accordance with" its order regarding the "Policy Limits Issues." The policy limits order did not consider or purport to decide the validity of Holderness's contract claim for violations of AS 21.89.020(e)'s waiver provision. We thus interpret the superior court's subsequent entry of partial summary judgment to be similarly limited, and we conclude that the judgment does not bar Holderness from pursuing his separate claim for violation of AS 21.89.020(e).

### E. The Arbitration Panel Decision

A panel of arbitrators heard Holderness's underinsured motorist claim, as mandated by his automobile policy. Under the policy, the arbitration panel was to answer two questions:

1. Is the insured legally entitled to collect damages from the owner or driver of the uninsured motor vehicle or underinsured motor vehicle; and

2. If so, in what amount?

In presenting this case to the panel, the parties stipulated that Holderness was legally entitled to damages and submitted no evidence concerning "relative fault or the like." Thus, the arbitration addressed only the amount of damages Holderness suffered, which the panel found to be $7,308,076.

On appeal, Holderness argues that the trial court erred by refusing to confirm the arbitration panel's decision "on both liability and damages." But because the parties stipulated that the motorist who hit Holderness was at fault, the amount of damages was the only point at issue before the arbitration panel. The arbitrators found that amount to be $7,308,076, and the superior court's order confirmed this finding. As the panel correctly observed, the question of whether State Farm owes Holderness any payment was not before it: "The extent of State Farm's liability, if any, for policy limits or beyond has not been presented to nor determined by this Panel. Our decision merely establishes the extent of Holderness's damages resulting from the accident." The superior court's order correctly reflected this statement. We therefore uphold the confirmation order.

### F. Arbitration Attorney's Fees

■ Holderness sought, and the trial court denied, Civil Rule 82 attorney's fees based on the amount of damages the arbitration panel found that he had suffered. We have previously held that "Civil Rule 82 only applies to 'costs of the action' not attorney's fees incurred in the conduct of the prior arbitration."[42] Thus, the trial court correctly denied Holderness's motion for Rule 82 at-

---

**41.** As a surgeon and executive officer of Alaska Podiatry Associates, Holderness regularly worked both at his office and at the hospital. The record fails to suggest that driving from home to the hospital exposed Holderness to any greater risk than he would have encountered had he been driving to his office. Given these circumstances, the fact that the accident occurred when Holderness was driving to the hospital

rather than to his office has no special significance for purposes of applying the going-and-coming rule.

**42.** *Integrated Resources Equity Corp. v. Fairbanks N. Star Borough*, 799 P.2d 295, 300 (Alaska 1990) (quoting *Alaska State Hous. Auth. v. Riley Pleas, Inc.*, 586 P.2d 1244, 1249 (Alaska 1978)).

torney's fees based on the arbitration panel's findings.

## IV. CONCLUSION

We AFFIRM in part and REVERSE in part the superior court's order granting partial judgment, and REMAND for further proceedings consistent with this decision.