In the Matter of the Necessity for the Hospitalization of TRACY C.

No. S–13719.

Supreme Court of Alaska.

April 22, 2011.

Douglas Moody, Assistant Public Defender, and Quinlan Steiner, Public Defender, Anchorage, for Tracy C.

Megan R. Webb, Assistant Attorney General, Anchorage, and Daniel S. Sullivan, Attorney General, Juneau, for Alaska Psychiatric Institute.

Before: CARPENETI, Chief Justice, FABE, WINFREE, CHRISTEN, and STOWERS, Justices.

*OPINION*

FABE, Justice.

## I. INTRODUCTION

Tracy C. was committed involuntarily for 30 days to the Alaska Psychiatric Institute (API).[1] She appeals the commitment order, arguing that because her condition had stabilized as a result of treatment between the time of her admission to API and her commitment hearing, it was error for the superior court to find that she was gravely disabled. Although Tracy's claim is moot, the public interest exception applies because Tracy raises a question of statutory interpretation that would benefit from resolution. We conclude (1) that an order granting a petition for involuntary commitment must be based on the patient's condition at the time of the commitment hearing rather than at the time of the patient's admission to the treatment facility; (2) that in determining the patient's condition at the time of the

---

1. Pseudonyms have been used to protect the privacy of the parties.

commitment hearing the trial court can consider the patient's recent conduct and conditions as well as the patient's symptoms at the time of the hearing; and (3) that the superior court correctly applied the involuntary commitment statute in this case. We thus affirm the order of the superior court granting the petition for Tracy's 30–day involuntary commitment.

## II. FACTS AND PROCEEDINGS

On October 22, 2009, Tracy's husband filed a petition to initiate involuntary commitment proceedings against Tracy. Tracy's husband stated in the petition that his wife had been diagnosed with "psychotic disorder not otherwise specified" and that her refusal to take medication for this disorder was leading to increasingly erratic and dangerous behavior. Among other allegations, he reported that Tracy had been fired from her job; was spending large sums of money erratically; was leaving the house during the middle of the night; was making repeated phone calls to 911 and federal government agencies alleging that she was being watched; and was claiming that her doctors and husband were trying to poison her.

On October 23, in response to the petition, the superior court ordered that Tracy be taken to the Alaska Psychiatric Institute (API) and that API conduct a screening evaluation of Tracy and report its findings to the court within 48 hours. Later that day Dr. Dan Muschevici, a psychiatrist at API, filed a petition for 30–day commitment after evaluating Tracy. The petition stated that Tracy was gravely disabled and likely to cause harm to herself or others, and that there was not a less restrictive treatment alternative that would be adequate. Where the petition asked for "facts and specific behavior" supporting these allegations, Dr. Muschevici wrote that Tracy had a history of bipolar I disorder and had been hospitalized at API three times in the previous month. He went on to explain that Tracy had previously refused treatment, that she was having "a new manic and psychotic episode" with "disorganized behavior" and "impaired judgment," that she could not care for herself, and that

she "need[ed] inpatient stabilization." The superior court scheduled a commitment hearing for October 27 and appointed the Alaska Public Defender Agency to represent Tracy.

At the hearing on October 27, a probate master heard testimony from Dr. Muschevici, as well as Tracy's husband and Tracy herself. On direct examination, Dr. Muschevici testified that he had diagnosed Tracy with "[b]ipolar I disorder: [m]ost recent episode manic, severe with psychotic features" and that this diagnosis qualifies as a mental illness.[2] Dr. Muschevici noted that the October 23 hospitalization was Tracy's third admission to API in the past month, that he had evaluated her on all three occasions, and that Tracy was experiencing a manic episode of bipolar I disorder. Dr. Muschevici described the symptoms that led to his conclusion, including Tracy's agitation; her conduct of speaking in a rambling and tangential manner and laughing inappropriately; her impaired judgment; and her paranoid delusions about her family, her former employer, and her doctors. Dr. Muschevici noted that upon this admission, unlike her other admissions to API, Tracy agreed that she needed treatment for her bipolar disorder.

Dr. Muschevici also testified that he believed Tracy posed a risk of harm to herself because she was disconnected from reality and could easily be exploited or harmed by others. He clarified that he did not believe that Tracy was suicidal or that she posed a risk to others. He noted that although Tracy had improved since beginning treatment upon her admission to API, he believed that she was still gravely disabled. He explained that when Tracy was admitted "[s]he was not able at that time to take care of herself. She was not able to socialize appropriately to have a normal family life, personal life," and that this would inhibit her ability to survive safely in the community. Dr. Muschevici further testified that Tracy had refused medication during her past two admissions at API, that without medication she "cannot function appropriately," and that given her acute state there was not a less restrictive

**2.** Dr. Muschevici also diagnosed Tracy with attention deficit hyperactivity disorder.

treatment alternative than her current psychiatric medication.

On cross-examination, Tracy's attorney pressed Dr. Muschevici on whether Tracy was still exhibiting the psychotic symptoms that Dr. Muschevici had observed on the day of the initial evaluation. Dr. Muschevici agreed that on the day of the hearing and the previous day, he had not observed symptoms of paranoid delusion in Tracy and that she was improving. He stressed, however, that he still considered Tracy to be in an acute state and that she did not fully understand her need for treatment. Although Dr. Muschevici conceded that Tracy could receive psychotherapy and medication outside of API, he maintained that outpatient therapy was not a good option "at an acute state." Dr. Muschevici further testified that Tracy was cooperating with treatment, socializing, sleeping, and eating better since her admission to API, but said that he believed Tracy should stay at API because her "acute condition could relapse any time" and without medication in "one, two days she could be back [i]n the same psychotic condition."

On redirect, Dr. Muschevici clarified that although Tracy's symptoms on the day of the hearing were only "hypomanic," he still considered her to be in an "acute state" because she had presented manic symptoms only days before. He testified that he believed Tracy was "still ... in need [of] therapy for acute psychotic manic symptoms" and that without medication, he would expect Tracy to return to API with psychotic symptoms within a week.

Tracy's husband also testified, recounting the same events that he had detailed in his petition to initiate involuntary commitment proceedings. He reported, among other things, that in the previous week Tracy had left the house in the middle of the night, had smashed a sliding glass door when she locked herself out of the house, had accused her husband of trying to poison her, and had refused to take medication.

Tracy testified on her own behalf. Tracy admitted that she had been suffering from paranoia when she was admitted to API the previous Friday, but promised that she would continue to take medication and see a psychiatrist if she left API. But Tracy's testimony also demonstrated that her thought process was still somewhat paranoid and disjointed. For instance, Tracy explained that she had been admitted to API because her husband "basically needed the house alone for the weekend"; that she had smashed the glass door because her husband "or someone else in my best interest had hidden all of my keys, drained my gas so many times"; and that API "is a free hotel, an excellent place to visit, great food and an amazing amount of geniuses that are inmates along with me."

In closing, Tracy's attorney argued that Tracy's condition had stabilized since her admission and that, based on her symptoms on the day of the hearing, API could not show by clear and convincing evidence that Tracy was either gravely disabled or likely to cause harm to herself or others.

The master issued oral findings and a recommendation based primarily on the testimony of Dr. Muschevici. The master first made a finding that Tracy was suffering from mental illness in the form of bipolar I disorder. The master also found that although Tracy did not present a risk of harm to herself or others, she was gravely disabled, basing his finding on Dr. Muschevici's testimony that despite some improvement, Tracy's condition remained acute and her judgment remained impaired. The master also stated that Dr. Muschevici testified that Tracy was "very psychotic, very manic" on the day of the hearing. The master concluded that although Tracy had improved, she had not stabilized, and that there was no less restrictive treatment because "the doctor says that if [Tracy] is discharged in her current acute state that she would be re-hospitalized shortly." The master recommended that the commitment petition be granted.

When Tracy's attorney questioned whether Dr. Muschevici had testified that Tracy was psychotic and manic on the day of the hearing, the master responded that he would put his findings in writing so that Tracy could file written objections. The master's written findings stated:

Dr. Muschevici diagnosed the respondent as suffering bipolar I disorder, most

recent episode manic, severe, with psychotic features. The doctor said he observed consistent symptoms including manic, pressured and agitated speech and behavior. He said the respondent has problems expressing herself, exhibits mood swings and laughs inappropriately. He said respondent's psychotic symptoms include paranoid delusions regarding spouse, family and job. He said respondent's thinking is impaired and is rambling, tangential and disassociated.

The respondent is not currently a risk of harm to self or others as there was no evidence of volitional suicidal or assaultive behavior or threats of harm by the respondent since her admission.

There is clear and convincing evidence the respondent is gravely disabled as [Tracy] is currently in a condition where, as a result of her manic and psychotic symptoms and behavior as per the doctor's description, she will continue to suffer emotional, mental and physical distress which significantly impairs her judgment and causes a substantial deterioration of her previous ability to function independently. The doctor testified that the respondent has improved since her admission and several days of treatment but said that she is not yet stable or has adequate judgment to maintain herself and function safely in a free environment. The doctor said the respondent's condition is still acute and her thinking is impaired.

There is not a less restrictive treatment option until the respondent's condition is improved so her thinking is less impaired and she is able to utilize outpatient mental health services and maintain herself safely. The doctor said that if [Tracy] is discharged without further treatment she would be rehospitalized shortly as has been the case with her prior admissions in the last month.

Tracy filed written objections, objecting primarily to all findings that Tracy's "current condition" included "manic and psychotic symptoms" and that Tracy would be "rehospitalized shortly" if discharged without further treatment. After reviewing Tracy's objections, the superior court signed the proposed findings. Tracy filed this appeal.

## III. STANDARD OF REVIEW

■ We review factual findings in involuntary commitment proceedings for clear error and will reverse only if a review of the record leaves us with a definite and firm conviction that a mistake has been made.[3] We "will grant especially great deference when the trial court's factual findings require weighing the credibility of witnesses and conflicting oral testimony."[4] Whether factual findings comport with the requirements of the involuntary commitment statute is a legal issue that we review de novo.[5] We apply our independent judgment to the interpretation of Alaska statutes[6] and will interpret statutes "according to reason, practicality, and common sense, taking into account the plain meaning and purpose of the law as well as the intent of the drafters."[7] "We apply our independent judgment to issues of mootness because as a matter of judicial policy, mootness is a question of law."[8]

## IV. DISCUSSION

### A. Tracy's Appeal Falls Within The Public Interest Exception To The Mootness Doctrine.

■ API urges us to dismiss Tracy's appeal as moot. API points out that the 30–day term of Tracy's commitment has long since passed and argues that her appeal does not fall under the public interest exception to the mootness doctrine. Tracy responds that the public interest exception applies because her appeal presents a question of statutory

3. *Wetherhorn v. Alaska Psychiatric Inst.*, 156 P.3d 371, 375 (Alaska 2007).

4. *Bigley v. Alaska Psychiatric Inst.*, 208 P.3d 168, 178 (Alaska 2009).

5. *Wetherhorn*, 156 P.3d at 375.

6. *Holderness v. State Farm Fire & Cas. Co.*, 24 P.3d 1235, 1237 (Alaska 2001).

7. *Native Village of Elim v. State*, 990 P.2d 1, 5 (Alaska 1999).

8. *Clark v. State, Dep't of Corr.*, 156 P.3d 384, 386 (Alaska 2007) (internal quotation marks omitted).

interpretation and that, in the alternative, we should adopt a collateral consequences exception to mootness for appeals from involuntary commitment orders.

■ We have held that "[a] claim is moot if it is no longer a present, live controversy, and the party bringing the action would not be entitled to relief, even if it prevails." [9] Under this standard Tracy's appeal is moot because the commitment order is no longer in effect and a ruling in her favor would not result in her release. We will, however, consider the merits of a claim that would otherwise be moot if the claim falls within the public interest exception to the mootness doctrine.[10] Whether the public interest exception applies depends on three factors: "(1) whether the disputed issues are capable of repetition, (2) whether the mootness doctrine, if applied, may cause review of the issues to be repeatedly circumvented, and (3) whether the issues presented are so important to the public interest as to justify overriding the mootness doctrine." [11]

We have recognized that because "an involuntary commitment is a massive curtailment of liberty," appeals from involuntary commitment orders raise questions that are important to the public interest.[12] Furthermore, appeals from involuntary commitment orders will usually evade review because "[i]t is quite unlikely that an appeal from a 30–day or 90–day commitment, or even a 180–day commitment, could be completed before the commitment has expired." [13]

Whether an appeal from a commitment order presents questions capable of repetition, however, depends on the nature of the issues presented for review. We held in *Wetherhorn v. Alaska Psychiatric Institute* that where a patient "was committed based on a specific set of facts" that were "specific to [her] condition immediately before and at the time of her hearing," the question whether those facts were sufficient to justify commitment was not capable of repetition.[14] A subsequent commitment hearing, or a commitment hearing involving a different patient, would involve a wholly different set of specific facts.[15] In contrast, we held in *Bigley v. Alaska Psychiatric Institute* that questions "regarding ... interpretation of the underlying statutory scheme in [commitment and medication] proceedings" did fall under the public interest exception, in part because "other patients are likely to raise similar claims in the future." [16]

API argues that Tracy's claim is not capable of repetition because she questions only whether there was sufficient evidence to justify her involuntary commitment. API is correct that Tracy's opening brief argues only that the superior court's findings supporting Tracy's commitment were clearly erroneous. In her reply brief, however, Tracy responds to API's mootness argument by asking us to apply the public interest exception because her appeal "presents a question of statutory interpretation that is subject to repetition." Tracy does not dispute that she displayed manic and psychotic symptoms on the date of her admission to API, but she argues that, due to her compliance with medication and treatment, by the time of the commitment hearing she was no longer gravely disabled. Tracy argues that her appeal presents the question whether the involuntary commitment statute "permits the commitment of a patient who is no longer gravely disabled, but whom the psychiatrist wants to keep at the hospital longer to return her to baseline." In other words, Tracy asks

9. *Wetherhorn,* 156 P.3d at 380 (quoting *Fairbanks Fire Fighters Ass'n, Local 1324 v. City of Fairbanks,* 48 P.3d 1165, 1167 (Alaska 2002)).

10. *Id.* at 380.

11. *Id.* at 380–81.

12. *E.P. v. Alaska Psychiatric Inst.,* 205 P.3d 1101, 1107 (Alaska 2009) (internal quotation marks omitted).

13. *Id.* at 1107.

14. *Wetherhorn,* 156 P.3d at 381.

15. *Id.; see also E.P.,* 205 P.3d at 1107 ("When disputed issues turn on unique facts unlikely to be repeated, we have refused to find an exception to mootness.").

16. 208 P.3d 168, 179 (Alaska 2009); *see also E.P.,* 205 P.3d at 1107 ("The matter of statutory interpretation ... does not depend on E.P.'s particular facts.").

us to decide whether AS 47.30.735(c) requires that a patient be gravely disabled at the time of the commitment hearing, as opposed to at the time of her admission to a mental health facility, in order to justify a 30–day involuntary commitment order.[17]

We agree with Tracy that this presents a question of statutory interpretation that is capable of repetition. In order to obtain a 30–day commitment order after evaluating a patient, two mental health professionals must file a petition for commitment that alleges, among other things, that the patient is "mentally ill and as a result is likely to cause harm to self or others or is gravely disabled."[18] In order to grant that petition, the court must hold a hearing and find by clear and convincing evidence that the patient is "mentally ill and as a result is likely to cause harm to [herself] or others or is gravely disabled."[19] It is possible, however, for a significant period of time to elapse between the filing of the petition and the hearing. Alaska Statute 47.30.715 requires that an involuntary commitment hearing be held within 72 hours after a patient arrives at the mental health facility for evaluation; however, this time period does not count Saturdays, Sundays, holidays, or the time it takes to transport the patient,[20] and the patient can elect to waive the 72–hour time limit.[21] If the time limit is waived the hearing must occur within seven calendar days of the patient's arrival at the treatment facility.[22]

As a result, the involuntary commitment hearing could take place as much as one week after the patient is admitted for evaluation. If a patient begins treatment immediately, it is possible that by the time of the hearing the patient will no longer be exhibiting the symptoms that led to her admission. Therefore, the question whether the statute refers to the patient's condition at the time of admission or at the time of the hearing is an important question of statutory interpretation that is capable of repetition. Because we apply the public interest exception, we need not reach the question whether the collateral consequences exception to mootness applies to appeals from involuntary commitment orders.

**B. A Patient May Only Be Committed Involuntarily If She Is Gravely Disabled At The Time Of The Commitment Hearing, But In Making That Determination The Court May Consider The Patient's Recent Behavior And Condition As Well As The Patient's Symptoms At The Time Of The Hearing.**

A petition for a 30–day involuntary commitment may be granted if the trial court finds, by clear and convincing evidence, that a patient "is mentally ill and as a result is likely to cause harm to [herself] or others *or* is gravely disabled."[23] Under AS 47.30.915(7):

"[G]ravely disabled" means a condition in which a person as a result of mental illness

(A) is in danger of physical harm arising from such complete neglect of basic needs for food, clothing, shelter, or personal safety as to render serious accident, illness, or death highly probable if care by another is not taken; or

(B) will, if not treated, suffer or continue to suffer severe and abnormal mental, emotional, or physical distress, and this distress is associated with significant impairment of judgment, reason, or behavior causing a substantial deterioration of the

---

**17.** The procedures for a 30–day commitment hearing are specified in AS 47.30.735. Subsection (c) states:

At the conclusion of the hearing the court may commit the respondent to a treatment facility for not more than 30 days if it finds, by clear and convincing evidence, that the respondent is mentally ill and as a result is likely to cause harm to the respondent or others or is gravely disabled.

**18.** AS 47.30.730(a).

**19.** AS 47.30.735(c).

**20.** AS 47.30.805(a)(1).

**21.** AS 47.30.725(f). In order to waive the time limit the patient must be represented by counsel. *Id.*

**22.** *Id.*

**23.** AS 47.30.735(c) (emphasis added).

person's previous ability to function independently.

Tracy was committed under the definition provided in AS 47.30.915(7)(B), and we have held that AS 47.30.915(7)(B) "must be construed so that the 'distress' that justifies commitment refers to a level of incapacity that prevents the person in question from being able to live safely outside of a controlled environment."[24] Tracy does not dispute that she met this definition at the time of her admission to API for evaluation but claims that by the time of her commitment hearing she had improved and was no longer gravely disabled. She argues that the superior court erroneously based its commitment order on her symptoms at the time of admission rather than on her condition at the time of the commitment hearing.

We agree with Tracy that, as a matter of statutory interpretation, the superior court must find by clear and convincing evidence that a patient is mentally ill and gravely disabled or likely to harm herself or others at the time of the commitment hearing. The superior court may not involuntarily commit a patient based only on the patient's symptoms at the time of admission to a treatment facility if by the time of the hearing the patient is no longer mentally ill and gravely disabled or likely to harm herself or others.

This interpretation is clear from the plain language of the involuntary commitment statute. Alaska Statute 47.30.735, which specifies the procedures for a 30–day commitment hearing, states:

> At the conclusion of the hearing the court may commit the respondent to a treatment facility for not more than 30 days if it finds, by clear and convincing evidence, that the respondent *is* mentally ill and as a result *is* likely to cause harm to the respondent or others or *is* gravely disabled.[25]

Other sections of the involuntary commitment statute support this interpretation by indicating that patients should be released as soon as they are no longer gravely disabled or likely to harm themselves or others. Alaska Statute 47.30.720, titled "Release before expiration of 72–hour period," provides:

> If at any time in the course of the 72–hour [evaluation] period the mental health professionals conducting the evaluation determine that the respondent does not meet the standards for commitment ... the respondent shall be discharged from the facility or the place of evaluation by evaluation personnel and the petitioner and the court so notified.

Alaska Statute 47.30.780, titled "Early discharge," similarly provides that once commitment has begun, "the professional person in charge shall at any time discharge a respondent on the ground that the respondent is no longer gravely disabled or likely to cause serious harm as a result of mental illness."

The statute thus plainly supports Tracy's contention that a commitment order must be based on the patient's condition at the time of the commitment hearing. A patient who is no longer gravely disabled at the time of the hearing may not be committed involuntarily. This interpretation is also in line with our decision in *Wetherhorn*, which emphasized the high standard required to justify the massive curtailment of liberty that involuntary commitment represents: "[I]t is not enough to show that care and treatment of an individual's mental illness would be preferred or beneficial or even in [the patient's] best interests."[26]

At the same time, nothing in the statutory framework suggests that, when deciding whether a patient is gravely disabled, the superior court is limited to considering only the symptoms exhibited by the patient on the day of the commitment hearing. Tracy emphasizes throughout her argument that on the day of the hearing she was taking her medication, sleeping and eating better, and displaying "hypomanic" rather than manic or psychotic symptoms. But it would defy com-

**24.** *Wetherhorn v. Alaska Psychiatric Inst.*, 156 P.3d 371, 378 (Alaska 2007).

**25.** AS 47.30.735(c) (emphasis added).

**26.** *Wetherhorn*, 156 P.3d at 378 (quoting *In re LaBelle*, 107 Wash.2d 196, 728 P.2d 138, 146 (1986)).

mon sense to ignore Tracy's treatment history, which supplied context for her symptoms on the day of the hearing. Our decision in *Wetherhorn* suggested that the superior court may also consider any "recent acts" when deciding whether a patient is gravely disabled.[27] In that case, Wetherhorn argued that allowing involuntary commitment for patients who were "gravely disabled" was unconstitutional because the definition of "gravely disabled" did not require that the patient be in imminent danger.[28] We responded:

> We have not yet addressed the question whether the concept of imminence is compatible with the passive nature of harm reflected in the "gravely disabled" definition or whether the "facts and specific behavior of the respondent" required by AS 47.30.730(a)(7) must include recent acts. But we need not address those issues here, *because the facts alleged in this case were drawn from the recent past.* The petition stated that Wetherhorn had shown a manic state, a lack of insight, and non-compliance with her medication for the past three months. And during the hearing, Dr. Kiele testified that Wetherhorn remained confused and agitated and that her difficulties with insight had not changed since she had been at the hospital.... *Because all these examples of specific behavior were drawn from the recent past, they were sufficient to meet the evidentiary standards established by those states that have addressed the question of imminence.*[29]

Although we did not decide whether evidence of recent behavior is required for a finding that a patient is gravely disabled, we did recognize that recent acts are appropriate for the superior court to consider. We therefore conclude that although the superior court may only grant an involuntary commitment petition if it finds by clear and convincing evidence that the patient is mentally ill and likely to harm herself or others or is gravely disabled at the time of the commitment hearing, when making that determination the court may consider the patient's recent behavior and condition as well as the patient's symptoms on the day of the hearing.

### C. The Superior Court Applied The Statute Correctly In Determining That Tracy Was Gravely Disabled On The Day Of The Commitment Hearing.

 We now turn to the question whether the superior court complied with the requirements of the involuntary commitment statute in this case. "Whether factual findings comport with the requirements of [the involuntary commitment statute] presents a legal issue, which we review de novo."[30]

 Tracy argues that the superior court granted the commitment petition so that API could continue her treatment and return her to her "baseline," even though she was no longer gravely disabled. We disagree. The master's written findings, adopted by the superior court, expressly concluded that Tracy was gravely disabled on the day of the commitment hearing. In his written findings, the master summarized Dr. Muschevici's observations of Tracy's recent behavior, including her manic and psychotic symptoms at the time of her admission, and determined that Tracy was "*currently* in a condition where ... she will continue to suffer emotional, mental and physical distress which significantly impairs her judgment and causes a substantial deterioration of her previous ability to function independently."[31]

27. *Id.* at 379.

28. *Id.* at 378.

29. *Id.* at 379 (emphasis added) (internal footnotes omitted); *see also In re LaBelle*, 728 P.2d at 145–46 (interpreting a similar statute to allow a finding that a patient was gravely disabled even if the patient had improved slightly by the time of the commitment hearing so long as there was "recent proof of significant loss of cognitive or volitional control" and inpatient care was essential to the patient's health or safety).

30. *Wetherhorn*, 156 P.3d at 375.

31. Tracy argues that this finding is clearly erroneous because the master's oral findings mistakenly stated that Dr. Muschevici testified that Tracy was manic and psychotic on the date of the hearing. The question whether specific facts are sufficient to justify involuntary commitment is not capable of repetition and therefore moot. *Wetherhorn*, 156 P.3d at 381. We note in passing, however, that the master's written findings did not contain this mistaken assertion and that when oral and written findings are inconsistent,

(Emphasis added.) The master's findings recognized that Tracy had improved somewhat since her admission but specifically determined that Tracy was "not yet stable," that she did not have "adequate judgment to maintain herself and function safely in a free environment," and that her "condition [was] still acute and her thinking [was] impaired." The findings also explained that Tracy could not properly access outpatient treatment while her thinking was so impaired, and that without further treatment she would likely be hospitalized again.[32]

In summary, the superior court properly applied the involuntary commitment statute when it granted the petition based on Tracy's condition at the time of the hearing and considered Tracy's recent symptoms and behavior in making that determination.

## V. CONCLUSION

We conclude that although Tracy's claims are moot, the public interest exception to the mootness doctrine applies because Tracy presents a question of statutory interpretation that is capable of repetition. A finding that a patient is mentally ill and likely to harm herself or others or is gravely disabled must be based on the patient's condition at the time of the commitment hearing. But in making that finding, the trial court can consider the patient's recent behavior and symptoms, as well as the symptoms exhibited at the time of the commitment hearing. In this case, the superior court properly applied the involuntary commitment statute. For these reasons, the order of the superior court granting the petition for involuntary commitment is AFFIRMED.

---

the written decision normally prevails. *See Ogden v. Ogden*, 39 P.3d 513, 518 (Alaska 2001).

**32.** Tracy also argues that the evidence only showed that she was likely to be hospitalized again if she stopped taking her medication. This argument is also moot, *Wetherhorn*, 156 P.3d at 381, but we note that the probate master heard testimony from both Dr. Muschevici and Tracy's husband that Tracy had repeatedly stopped taking her medication in the past. The probate master also heard Tracy's own testimony and had the opportunity to judge her credibility.