*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.us.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | |
|---|---|
| In the Matter of the Necessity for the Hospitalization of<br><br>JACOB S. | Supreme Court Nos. S-15847/15868<br><br>Superior Court No. 3AN-14-03156 PR<br><br>O P I N I O N<br><br>No. 7133 – November 18, 2016 |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Patrick J. McKay, Judge.

Appearances: Meg Allison Zaletel, Zaletel Law, Anchorage, for Appellant. Dario Borghesan, Assistant Attorney General, Anchorage, and Craig W. Richards, Attorney General, Juneau, for Appellee.

Before: Stowers, Chief Justice, Winfree, Maassen, and Bolger, Justices.

WINFREE, Justice.

## I.     INTRODUCTION

The respondent in involuntary commitment and medication proceedings appeals a number of issues related to findings that he was mentally ill and posed a risk of harm to others. The superior court ordered both 30- and 90-day commitments — the latter following a jury trial. The court also entered medication orders after finding the respondent unable to make mental health treatment decisions.

Primary among the issues the respondent raises are two legal questions. First, when a respondent requests a jury trial on a 90-day commitment petition, who — between the jury and the court — decides the factual underpinning for and the ultimate question of least restrictive alternative to commitment? We conclude that this decision making is for the court. Second, AS 47.30.837(d)(1) sets out a four-part test — joined by the conjunctive "and" — for determining whether a respondent is competent to make mental health treatment decisions; can a respondent be found incompetent if one part is not met? We conclude that the answer is "yes."

With these conclusions in mind, we resolve the issues raised by the respondent in the State's favor. We therefore affirm the superior court's commitment and medication orders.

## II.    FACTS AND PROCEEDINGS

Jacob S.[1] was hospitalized for a mental health evaluation in January 2015, after his domestic partner filed an involuntary commitment petition because Jacob stopped taking his medication, she observed him experiencing paranoid delusions about their neighbor, and she thought his delusions had caused him to act violently toward their neighbor. After an evaluation Dr. David Mack at Alaska Psychiatric Institute (API) filed a 30-day commitment petition asserting that Jacob had a mental illness and was likely to cause harm to himself or others. Dr. Mack also petitioned for court approval to administer psychotropic medication because Jacob lacked capacity to give informed consent.

A magistrate judge held a hearing on the petitions. Both Jacob's neighbor and Jacob's partner testified telephonically. Jacob's neighbor testified that Jacob had filed a restraining order against her in November 2014 alleging that she was stalking him,

---

[1]     A pseudonym has been used to protect the respondent's privacy.

had broken into his house, and had been tasing him with a "stop gun." The neighbor also testified to her suspicion that Jacob had thrown a rock through her window and attempted to set fire to her house with a "Molotov cocktail" on two separate occasions the previous month.

Jacob's partner testified that she recognized several bottles from the "Molotov cocktail" incident as having come from their house. She also testified that Jacob had been doing "strange things" and then did not remember what he had done, for example connecting an electric welder to their house's back door. He had unplugged the telephone then denied doing so. He layered towels, cardboard, newspaper, and pillows over the house's windows and couch to protect himself from the neighbor's "tasing."

Dr. Mack testified about Jacob's delusional disorder diagnosis. Dr. Mack was concerned that Jacob's strange behavior concerning his neighbor was connected to his fixed delusions, but Dr. Mack thought psychotropic medication might soften those delusions. Jacob refused to acknowledge he was suffering from delusional disorder, and he had not yet received medication.

Finding that Jacob suffered from a mental illness and posed a risk of danger to others, the magistrate judge recommended the 30-day commitment. The magistrate judge then addressed the medication petition. The court-appointed visitor testified that although Jacob "demonstrate[d] rational thought process in regards to medications," his inability to recognize his mental illness meant "he would not have the capacity based on that particular reason alone." Dr. Mack stated that treatment methods other than psychotropic medication would not be successful and that Jacob could meaningfully participate in treatment decisions only if he recognized his disorder. The magistrate judge found that Jacob lacked capacity to give informed consent, that medication was in Jacob's best interests, and that no less restrictive alternative was available. The superior court approved and adopted these findings and issued the orders.

Dr. Mack filed another petition in February for a 90-day commitment order and an accompanying petition to continue administration of psychotropic medication. Jacob requested a jury trial.[2]  Much of the trial testimony concerned Jacob's mental health and actions prior to his original commitment and was repetitious of that given at the 30-day commitment hearing.  Jacob's brother testified that he was willing to provide housing if Jacob were released from API.  Because Jacob's brother's residence is only two blocks away from Jacob's, the State questioned whether that placement would protect Jacob's neighbor.  Jacob's brother responded that he would monitor Jacob and prevent him from returning there.  Timothy Mannen, a board-certified psychiatric nurse practitioner at API, testified that someone with Jacob's delusions would not simply get better over time and that merely moving Jacob to a new residence would not alleviate the delusions.  Mannen stressed that although treatments other than commitment and medication, like therapy, are available, it is difficult to convince a person suffering from delusional disorder to "restructure or realize that what . . . they are thinking that is fixed and false and disordered is not true."

The jury found that Jacob was mentally ill; that as a result he was likely to cause harm to others; and that he was advised of, but did not accept, voluntary treatment. The superior court then held a further evidentiary hearing to decide whether a less restrictive alternative to commitment existed and whether involuntary medication was in Jacob's best interests. Jacob testified, expressing a willingness to take medication and participate in therapy if he were released to a family member's home.  Mannen testified that placement with a family member was not appropriate because Jacob's response to the medication was not yet "robust" enough.  The court visitor who had interviewed

---

² AS 47.30.745(c) entitles a 90-day commitment petition respondent to a jury trial on request.  In contrast no similar right is provided under AS 47.30.735(b)(1)-(9) for a 30-day commitment petition.

Jacob a week earlier testified that he did not have the capacity to participate in his treatment planning. The court determined that until Jacob's delusions softened, releasing him to a family member would not adequately protect the public. The court also expressed doubt that Jacob would take his medication if released from API. The court determined that no less restrictive alternative to commitment at API existed at that time, and that medication was in Jacob's best interests.

Jacob appeals, arguing that allowing telephonic testimony at the 30-day hearing violated his due process rights and was an abuse of discretion and that the 30- and 90-day commitment orders and the medication orders were erroneously issued. The State contends that the superior court's rulings were correct and that Jacob's challenges to the medication orders are moot.

## III. STANDARDS OF REVIEW

We review a trial court's decision to allow telephonic testimony for abuse of discretion.[3] "We will find an abuse of discretion when the decision on review is manifestly unreasonable."[4] "Factual findings in involuntary commitment or medication proceedings are reviewed for clear error," and we reverse those findings only if we have a "definite and firm conviction that a mistake has been made."[5] Whether those findings meet the involuntary commitment and medication statutory requirements is a question

---

[3]    *See Richard B. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.*, 71 P.3d 811, 817 (Alaska 2003) (citing *Midgett v. Cook Inlet Pre-Trial Facility*, 53 P.3d 1105, 1109 (Alaska 2002)).

[4]    *Ranes & Shine, LLC v. MacDonald Miller Alaska, Inc.*, 355 P.3d 503, 508 (Alaska 2015) (citing *Tufco, Inc. v. Pac. Envtl. Corp.*, 113 P.3d 668, 671 (Alaska 2005)).

[5]    *Wetherhorn v. Alaska Psychiatric Inst.*, 156 P.3d 371, 375 (Alaska 2007) (citing *Martin N. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.*, 79 P.3d 50, 53 (Alaska 2003)).

of law we review de novo.[6] "We apply our independent judgment to the interpretation of both the Alaska Constitution and statutes, adopting 'the rule of law that is most persuasive in light of precedent, reason, and policy.' "[7] We use our independent judgment to determine if a pending controversy is moot.[8]

## IV. DISCUSSION

### A. The 30-Day Commitment Order

#### 1. It was not error to allow telephonic testimony at the hearing.

Jacob asserts that it was a violation of his due process rights to allow his partner and his neighbor to testify telephonically at the 30-day hearing because their credibility was a central issue. "A civil litigant's right to confront witnesses is . . . founded upon notions of procedural due process," and the question we must decide is "whether due process, in this case, necessitates that" Jacob "be afforded the right to [confront]" the witnesses in person rather than telephonically.[9] Alaska uses the *Mathews v. Eldridge* three-part balancing test "for determining the necessary extent of due process" in the commitment context.[10] We consider:

---

[6] *Id.*

[7] *Id.* (footnotes omitted) (quoting *Guin v. Ha*, 591 P.2d 1281, 1284 n.6 (Alaska 1979)) (first citing *Grinols v. State*, 74 P.3d 889, 891 (Alaska 2003); then citing *Holderness v. State Farm Fire & Cas. Co.*, 24 P.3d 1235, 1237 (Alaska 2001)).

[8] *In re Tracy C.*, 249 P.3d 1085, 1089 (Alaska 2011) (quoting *Clark v. State, Dep't of Corr.*, 156 P.3d 384, 386 (Alaska 2007)).

[9] *See In re A.S.W.*, 834 P.2d 801, 805 (Alaska 1992) (citing *Thorne v. State, Dep't of Pub. Safety*, 774 P.2d 1326, 1332 (Alaska 1989)) (determining whether due process required civil litigant be given the right to confront witness against him).

[10] *Bigley v. Alaska Psychiatric Inst.*, 208 P.3d 168, 181 (Alaska 2009) (citing *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976)).

First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.[11]

Involuntary commitment imposes a serious limitation on an individual's liberty interest,[12] and Jacob's insistence that witnesses testify in person thus implicates a private interest of significant weight.

We have previously examined the risk of erroneous deprivation of a right and stated that "[a]lthough the due process analysis is a flexible and contextual one focusing on the interest and not the outcome, there must be some actual prejudice under the second prong and not merely the 'theoretical possibility of prejudice.' "[13] This means Jacob must show that he "was likely to have achieved a more favorable outcome" had the witnesses testified in person.[14] Jacob's attorney cross-examined the witnesses, but chose not to attack their credibility during the cross-examination. When Jacob's attorney objected to the telephonic testimony, the magistrate judge responded that he would "be

---

[11]    *Id.* (quoting *Whitesides v. State, Dep't of Pub. Safety, Div. of Motor Vehicles*, 20 P.3d 1130, 1135 (Alaska 2001) (setting out *Mathews* balancing test)).

[12]    *Wetherhorn*, 156 P.3d at 375-76 (noting that involuntary commitment represents a "massive curtailment of liberty" (quoting *Humphrey v. Cady*, 405 U.S. 504, 509 (1972))).

[13]    *Paula E. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 276 P.3d 422, 433 (Alaska 2012) (footnote omitted) (quoting *D.M. v. State, Div. of Family & Youth Servs.*, 995 P.2d 205, 212 (Alaska 2000)).

[14]    *Id.*

careful" about credibility issues. Because Jacob's right to cross-examine the witnesses was protected and he made no express attempt to bring their credibility into question, we cannot easily conclude that a different result would have been reached had the witnesses testified in person.

The State's asserted interest is in providing evidence quickly so that "potentially dangerous people will [not] be released from the hospital without treatment that protects them and the community." Involuntary commitment hearings must occur within 72 hours of the respondent's initial detention,[15] requiring flexibility in gathering evidence to meet the deadline. We recognize the significant weight of the State's interest in protecting respondents and the community by providing evidence within that short time period.

Because the low erroneous deprivation risk and the State's great health and public safety interest tip the scale in the State's favor — even balanced against Jacob's significant liberty interest — we conclude that telephonic testimony at the 30-day hearing did not deprive Jacob of his due process rights.

In addition to his due process argument, Jacob contends that the magistrate judge abused his discretion because no good cause existed for the witnesses to appear telephonically. Courts have discretion to allow a witness to appear telephonically at a hearing "for good cause and in the absence of substantial prejudice to opposing parties."[16] The State expressed doubt that the witnesses could arrive at the hearing in a timely manner, in part because one witness is wheelchair bound; both witnesses also had protective orders in place against Jacob. The record supports that there was good cause for allowing telephonic testimony and Jacob has failed to establish any resulting

---

[15]     AS 47.30.725(b).

[16]     Alaska R. Civ. P. 99.

prejudice. We therefore conclude that the magistrate judge did not abuse his discretion in allowing the telephonic testimony.

### 2.     The 30-day order was not erroneously issued.

At the conclusion of a 30-day commitment hearing a court "may commit the respondent to a treatment facility . . . if it finds, by clear and convincing evidence, that the respondent is mentally ill and as a result is likely to cause harm to the respondent or others."[17] The respondent is "likely to cause serious harm" if the respondent "poses a substantial risk of harm to others as manifested by recent behavior causing, attempting, or threatening harm, and is likely in the near future to cause physical injury, physical abuse, or substantial property damage to another person."[18]

The superior court found that Jacob was mentally ill and was likely to cause harm to others as a result of his mental illness because of: (1) Jacob's partner's "serious concerns" about Jacob "doing things . . . that he was disavowing any knowledge of," including connecting an electric welder to their home's metal door; (2) his partner's recognition of "the bottles used to make the so-called Molotov cocktails . . . from her own house"; (3) his partner's testimony that there were "a couple incidents" involving "dangerous things occurring"; and (4) Dr. Mack's statements about whether Jacob's "delusions . . . [and] fixed false beliefs, [were] resulting in behavior that poses a substantial risk to others."

Jacob does not challenge the finding that he was mentally ill. But Jacob urges us to review de novo the superior court's decision regarding harm to others because Jacob "was committed based on speculation and not on facts sufficient to meet a clear and convincing standard of proof." We decline to do so because Jacob's

---

[17]     AS 47.30.735(c).

[18]     AS 47.30.915(12)(B); *In re Joan K.*, 273 P.3d 594, 598 (Alaska 2012).

argument, though couched as a legal question, simply asks us to reweigh the evidence presented at the 30-day hearing and choose between conflicting interpretations. We will not overturn a fact finding unless left "with a definite and firm conviction that a mistake has been made."[19] Conflicting evidence is generally insufficient to overturn a fact finding, and we will not reweigh evidence if the record supports the court's finding.[20]

Jacob's partner testified that she was concerned for her safety because of his actions. She stated that she recognized the bottles used to set fire to their neighbor's house as coming from her house. The neighbor's testimony also supports the court's inference that Jacob had been involved with both the rock and "Molotov cocktail" incidents. Dr. Mack described the danger of Jacob's delusional disorder as his false beliefs about his neighbor manifesting in actions like "setting dangerous booby traps, taking preemptive activities, or going to extreme measures to ensure security." Because evidence in the record supports the court's finding, we cannot say it is clearly erroneous. Accordingly, the 30-day order was not erroneously issued.

### B. The 90-Day Commitment Order

#### 1. The 30-day order did not taint the 90-day order.

Alaska Statute 47.30.740(c) allows "findings of fact relating to the respondent's behavior made at a 30-day commitment hearing under AS 47.30.735" to be admitted as evidence, and those findings "may not be rebutted except that newly

---

[19]    *In re Tracy C.*, 249 P.3d 1085, 1089 (Alaska 2011) (citing *Wetherhorn v. Alaska Psychiatric Inst.*, 156 P.3d 371, 375 (Alaska 2007)).

[20]    *Christina J. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 254 P.3d 1095, 1103 (Alaska 2011) ("Conflicting evidence is generally insufficient to overturn the superior court, and we will not reweigh evidence when the record provides clear support for the superior court's ruling.").

discovered evidence may be used for the purpose of rebutting the findings."[21]   Jacob asserts that this statute allowed the State to present much of the same evidence at the 90-day hearing as was provided at the 30-day hearing, prejudicing him because he could not raise issues concerning his partner's and neighbor's credibility or challenge the allegedly erroneous findings from the 30-day hearing without newly discovered evidence.

Jacob's first contention, that he was not able to raise issues concerning his partner's or neighbor's credibility, is without merit.  Jacob could have raised issues about those witnesses' credibility at the 90-day hearing regardless of any finding made at the 30-day hearing.[22]  But when Jacob cross-examined both witnesses at the 90-day hearing, he made no attempt to suggest they were not credible.

Jacob's second contention is also without merit.  Jacob argues that because he could not refute findings from the 30-day hearing without new evidence, legal and factual errors occurring in that proceeding tainted any findings from the 90-day hearing. But, as explained above, the 30-day order was not erroneously issued, and we find no error in accepting the facts established at the 30-day hearing.

### 2.    The jury instructions were correct.

Jury Instruction No. 17 reads:

> On January 12, 2015, the court issued findings of fact following hearings related to a petition for hospitalization. These facts cannot be rebutted during this hearing, unless [Jacob] brings forth new evidence.  This means you must accept those facts as true.  The facts that were established during each of those hearings were as follows:

---

[21]    AS 47.30.740(c).

[22]    *See Davis v. Alaska*, 415 U.S. 308, 316 (1974) ("The partiality of a witness is subject to exploration at trial, and is 'always relevant as discrediting the witness and affecting the weight of his testimony.' " (quoting 3A J. WIGMORE, EVIDENCE § 940 at 775 (1970))).

> (1) [Jacob] was mentally ill, and as a result of that illness, he posed a risk of harm to others.
>
> (2) [Jacob] was advised of and refused voluntary treatment.

Jacob contends that this instruction prejudiced him because it forced the jury to accept the legal conclusions from the 30-day hearing, eliminating the State's burden to prove that Jacob was mentally ill and as a result posed a risk of danger to others at the time of the 90-day hearing.[23]

Instruction No. 17 did not prejudice Jacob when read in concert with Instruction No. 12.[24] Instruction No. 17 informed the jurors that they must accept as true that Jacob "*was* mentally ill, and as a result of that illness, he posed a risk of harm to others" at the time of the 30-day hearing. (Emphasis added.) And Instruction No. 12 told the jury its task was to determine if Jacob "*is* mentally ill" and "as a result of his mental illness he *is* likely to cause harm to himself or others." (Emphases added.) This clearly reflects AS 47.30.755's requirement that a jury find Jacob mentally ill and posing a risk of danger *at the time of the 90-day hearing*.[25] There was no prejudicial error in the jury instructions.

---

[23] *See Tracy C.*, 249 P.3d at 1092 (interpreting 30-day commitment statute to require finding based on respondent's mental health at time of the hearing and noting that "[t]he superior court may not involuntarily commit a patient . . . if by the time of the hearing the patient is no longer mentally ill . . . or likely to harm []self or others").

[24] "An error in jury instructions is grounds for reversal only if it caused prejudice." *City of Hooper Bay v. Bunyan*, 359 P.3d 972, 978 (Alaska 2015) (quoting *Thompson v. Cooper*, 290 P.3d 393, 398-99 (Alaska 2012)).

[25] This statute allows the superior court to commit a respondent for 90 days if the "jury finds by clear and convincing evidence that the respondent is mentally ill and as a result is likely to cause harm to self or others." AS 47.30.755(a).

### 3. The 90-day order was supported by the evidence.

Jacob argues that the superior court should have disregarded the jury's finding that he was mentally ill and as a result was likely to cause harm to others because no evidence was presented at the 90-day hearing that Jacob was likely to cause harm to others. The parties disagree whether Jacob can challenge the court's decision directly or must challenge the jury's verdict, because AS 47.30.755(a) states that "the court may commit the respondent" if the jury finds that the respondent is mentally ill and is likely to cause harm to others. Our task in reviewing the 90-day order would change depending on whether we review the jury's verdict or the court's fact findings: We must affirm a jury's fact findings unless no evidence supports them,[26] but we review the court's fact findings to determine if they are clearly erroneous.[27] Because Jacob's argument is unavailing under either standard of review, we do not decide whether the court could have appropriately disregarded the jury's verdict in this case.

Jacob contends that the superior court "relied solely" on his refusal to take medication when it entered the 90-day commitment order following the jury's verdict. He asserts that after the initial medication order expired he was voluntarily compliant with his medication and that because of his compliance the court should have found he "did not meet the standard for commitment regardless of the jury's determination otherwise." But contrary to Jacob's assertion the court found, and our review of the record supports, that Jacob still posed a risk of harm to himself or others.

---

[26] *Nautilus Marine Enters., Inc. v. Valdez Fisheries Dev. Ass'n*, 943 P.2d 1201, 1205 n.8 (Alaska 1997) ("A jury's verdict will be overturned if there is no evidence supporting the verdict." (quoting *Municipality of Anchorage v. Baugh Constr. & Eng'g Co.*, 722 P.2d 919, 927 (Alaska 1986))).

[27] *Dale H. v. State, Dep't of Health & Soc. Servs.*, 235 P.3d 203, 209 (Alaska 2010).

There is strong evidence in the record that at the 90-day hearing Jacob still suffered from delusional disorder at the same intensity as during his 30-day commitment hearing. Mannen testified that he had reviewed the treatment team's records the day before the hearing began and that he evaluated Jacob after the hearing's first day. Mannen indicated that Jacob did not understand his diagnosis, had been on medication for only ten days, had not yet benefitted from the medication, and his delusions remained active. In response to the question "today, do you believe that [Jacob] poses a risk of harm to himself or other people," Mannen responded "I do, yes." Mannen explained his opinion was based on Jacob's lack of progress in softening his delusions. This evidence supports the jury's verdict and the court's issuance of the 90-day commitment order. It was not error to issue the 90-day commitment order.

## C.    No Less Restrictive Alternative To Commitment

### 1.    The superior court properly considered the question.

Courts must consider whether a less restrictive alternative would provide adequate treatment when contemplating involuntary commitment.[28] Alaska Statute 47.30.730(a)(2) requires a 30-day involuntary commitment petition to "allege that the evaluation staff has considered but has not found that there are any less restrictive alternatives available that would adequately protect the respondent or others." This

---

[28]    AS 47.30.915(11); *In re Joan K.*, 273 P.3d 594, 598, 601-02 (Alaska 2012) (finding no less restrictive alternative where surveillance by family would not provide sufficient support and patient's behavior lacked stability in part because she denied she was mentally ill). "Least restrictive alternative" means that the treatment facilities and conditions "are no more harsh, hazardous, or intrusive than necessary to achieve the treatment objectives of the patient" and "involve no restrictions on physical movement nor supervised residence or inpatient care except as reasonably necessary for the administration of treatment or the protection of the patient or others from physical injury." *Joan K.*, 273 P.3d at 599 (quoting AS 47.30.915(11)).

requirement carries over to a 90-day petition.[29] And AS 47.30.735(d) states that "[i]f the court finds that there is a viable less restrictive alternative available and that the respondent has been advised of and refused voluntary treatment through the alternative, the court may order the less restrictive alternative treatment." This requirement also carries over to a 90-day commitment.[30]

Alaska Statute 47.30.745(c) gives a respondent the right to a jury trial when contesting a 90-day commitment petition. Jacob asserts that his right to a jury trial should extend at minimum to the factual findings underpinning whether a less restrictive alternative exists.

An examination of AS 47.30.755 leads us to conclude that the less restrictive alternative decision, including any necessary fact findings underpinning that decision, rests with the court and not the jury.[31] Alaska Statute 47.30.755(a) specifically permits either "the court or jury" to find that a respondent is mentally ill and as a result

---

[29]    AS 47.30.740(a).

[30]    AS 47.30.755(b).

[31]    AS 47.30.755 provides:

> (a) After the hearing and within the time limit specified in AS 47.30.745, the court may commit the respondent to a treatment facility for no more than 90 days if the court or jury finds by clear and convincing evidence that the respondent is mentally ill and as a result is likely to cause harm to self or others, or is gravely disabled.

> (b) If the court finds that there is a less restrictive alternative available and that the respondent has been advised of and refused voluntary treatment through the alternative, the court may order the less restrictive alternative treatment after acceptance by the program of the respondent for a period not to exceed 90 days.

is likely to cause harm to others.[32]  In contrast AS 47.30.755(b) allows only "the court" to find that there is a less restrictive alternative.[33]  The language difference between the provision's two parts shows that the statute clearly was intended to allow only the court to make this decision.  And this makes sense in balancing the roles of the jury and the court — the less restrictive alternative determination requires balancing an individual's liberty interest, the State's interest in treating the individual, and available treatment options and facilities.[34]  This is a task uniquely suited to the court.  It was not error for the superior court to make the less restrictive alternative determination, including the factual findings underpinning that decision.

**2.    The record supports the superior court's less restrictive alternative decision.**

The superior court provided limited analysis in its written order concerning the existence of a less restrictive alternative: "[Jacob] has active delusions.  He does not believe he has a mental illness and is unlikely to take necessary medication.  There are no less restrictive alternatives for him right now. . . . No less restrictive facility would adequately protect [Jacob] and the public, and no less restrictive facility has accepted [Jacob]."

However the court's oral findings during the 90-day hearing were more in-depth.  The jury found that Jacob's continuing mental illness meant he posed a risk of danger to others, and the court noted that "[m]oving a couple blocks away [to his brother's house] probably is not going to protect [the neighbor] at this point" as Jacob's

---

[32]    AS 47.30.755(a).

[33]    AS 47.30.755(b).

[34]    *See Bigley v. Alaska Psychiatric Inst.*, 208 P.3d 168, 185 (Alaska 2009) (explaining existence of less restrictive alternative is mixed question of law and fact).

delusions about her had not yet softened. And the court explained that Jacob would remain "a danger to the public until" there were sufficient assurances that he would take his medication. The court had "no reason at [that] point to think that" Jacob would take his medication as part of outpatient treatment.

Jacob again asks us to weigh conflicting evidence to determine that the court's decision was incorrect, but we "grant especially great deference" to the trial court in these situations and "will reverse only if a review of the record leaves us with a definite and firm conviction that a mistake has been made."[35] Jacob points to Mannen's testimony that Jacob could be safely discharged under certain conditions and Jacob's brother's testimony that he would house and supervise Jacob as suggesting that a less restrictive alternative to treatment at API existed. Jacob argues that the State did not adequately explore the possibility of Jacob living with his brother because there "was no testimony from API that anyone had spoken with Jacob's brother about Jacob living with him to see if he could allay any concerns about the proposed living arrangement." But Mannen explained that changing Jacob's residence might "actually worsen his thinking" and that he might "work harder" to act on his delusions. Mannen also stated that family supervision was not an acceptable alternative to treatment at API until Jacob showed a more robust response to his medication and his delusions softened. Even though Jacob testified that he would be willing to take medication and participate in outpatient treatment if released from API, the superior court found Jacob's testimony was not credible, a finding we will not question on appeal.[36]

---

[35] *In re Tracy C.*, 249 P.3d 1085, 1089 (Alaska 2011) (quoting *Bigley*, 208 P.3d at 178) (citing *Wetherhorn v. Alaska Psychiatric Inst.*, 156 P.3d 371, 375 (Alaska 2007)).

[36] *See Hannah B. v. State, Dep't of Health & Soc. Servs., Office of Children's*

(continued...)

-17- **7133**

Because the record supports the superior court's determination — by clear and convincing evidence[37] — that no less restrictive alternative to commitment at API existed, that determination is not clearly erroneous.

## D. The Medication Order

### 1. Jacob's challenge to the medication order falls within the public interest exception to the mootness doctrine.

The superior court's order authorizing Jacob's "involuntary commitment does not authorize the [S]tate to treat [him] with psychotropic drugs."[38] "To treat an unwilling and involuntarily committed mental patient with psychotropic medication, the [S]tate must . . fil[e] a second petition, asking the court to approve the treatment it proposes to give."[39] In that petition the State must prove — by clear and convincing evidence — "that the committed patient is currently unable to give or withhold informed consent regarding an appropriate course of treatment" and that the patient never refused such treatment while previously competent.[40] If the court determines that the patient is not competent to make the decision, the court must next determine whether the

---

[36] (...continued)
*Servs.*, 289 P.3d 924, 930 (Alaska 2012) ("We defer to a superior court's credibility determinations, particularly when they are based on oral testimony." (citing *Pravat P. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 249 P.3d 264, 274 (Alaska 2011))).

[37] *In re Mark V.*, 375 P.3d 51, 58 (Alaska 2016) ("[A] petitioner must prove, by clear and convincing evidence, the petition's allegation that there are no less restrictive alternatives.").

[38] *Myers v. Alaska Psychiatric Inst.*, 138 P.3d 238, 242 (Alaska 2006).

[39] *Id.* at 242-43.

[40] *Id.* at 243 (first citing AS 47.30.836(3); then citing AS 47.30.839(g)).

medication is in the patient's best interests.[41] Jacob challenges both the superior court's determination that he was not competent and its finding that medication was in his best interests.

We note that challenges to involuntary medication orders generally are moot; due to the time required for appeal and the orders' temporary duration, even a favorable result on appeal will rarely stop involuntary medication.[42] "[A] claim is moot if it is no longer a present, live controversy, and the party bringing the action would not be entitled to relief, even if it prevails."[43] "We will, however, consider the merits of a claim that would otherwise be moot if the claim falls within the public interest exception to the mootness doctrine."[44] One circumstance that can bring a medication order challenge into this exception is when the challenge involves interpreting the underlying statutory scheme.[45] Jacob asserts that this case presents a question involving interpretation of AS 47.30.837(d), regarding when a patient is competent to make mental health treatment decisions, and we agree. We therefore consider Jacob's arguments.

---

[41]   *See id.* at 250, 252, 254.

[42]   *See, e.g.*, *In re Gabriel C.*, 324 P.3d 835, 839 (Alaska 2014) ("Gabriel's appeal of the involuntary medication order is moot because the record indicates that the order lapsed when his commitment ended.").

[43]   *Id.* (quoting *In re Tracy C.*, 249 P.3d 1085, 1090 (Alaska 2011)).

[44]   *Tracy C.*, 249 P.3d at 1090 (citing *Wetherhorn*, 156 P.3d at 380).

[45]   *See id.* at 1090-91 ("[Q]uestions 'regarding interpretation of the underlying statutory scheme in commitment and medication proceedings' . . . fall under the public interest exception . . . ." (alterations in original omitted) (quoting *Bigley v. Alaska Psychiatric Inst.*, 208 P.3d 168, 179 (2009))).

**2.	A single factor in AS 47.30.837(d)(1) can be dispositive when determining a patient's competency.**

Alaska Statute 47.30.837 permits a treatment facility to administer psychotropic drugs to a person involuntarily committed if, among other requirements, "the facility has reason to believe that the patient is not competent to make . . . mental health treatment decisions and the facility . . . follow[s] the procedures of AS 47.30.839."[46] "Competent" in this context means the patient:

> (A) has the capacity to assimilate relevant facts and to appreciate and understand the patient's situation with regard to those facts . . . ;
>
> (B) appreciates that the patient has a mental disorder or impairment, if the evidence so indicates; denial of a significantly disabling disorder or impairment, when faced with substantial evidence of its existence, constitutes evidence that the patient lacks the capability to make mental health treatment decisions;
>
> (C) has the capacity to participate in treatment decisions by means of a rational thought process; and
>
> (D) is able to articulate reasonable objections to using the offered medication.[47]

Jacob argues that the superior court found him incompetent based only on his inability to meet AS 47.30.837(d)(1)(B), an error because the statute requires a court to weigh all the elements to determine competence. According to Jacob we previously interpreted this statute to prevent a court from resting a competency decision on a single

---

[46]	AS 47.30.839 (setting out procedures for obtaining court order for forcibly administering psychotropic medication in both emergency and non-emergency situations).

[47]	AS 47.30.837(d)(1).

element.  In *Myers v. Alaska Psychiatric Institute* we briefly discussed AS 47.30.837, stating that "[u]nder this provision, a patient's inability to appreciate the presence of a mental disorder is a relevant consideration [for competency] but is not dispositive."[48] But AS 47.30.837's function and interpretation were not at issue in *Myers*.[49]  As the State correctly asserts, this means that our brief mention of the statute in *Myers* is properly considered dicta[50] and does not control our interpretation of the statute here.

Alaska Statute 47.30.837(d)(1) does not require a weighing of multiple factors — this statute defines when a patient is "competent" in four parts joined by the word "and."  Because the four parts are joined in the conjunctive, a plain reading of the statute suggests that the absence of any one element requires a finding that the patient is not competent.  Section (B)'s language further supports this reading of the statute: "[D]enial of a significantly disabling disorder or impairment, when faced with substantial evidence of its existence, constitutes evidence that the patient lacks the capability to make mental health treatment decisions."[51]  This language contemplates that a patient's denial of a significantly disabling mental illness, even when faced with substantial

---

[48]     138 P.3d 238, 243 (Alaska 2006) (citing AS 47.30.837(d)(1)(B)).

[49]     *Id.* at 254 (holding that the Alaska Constitution prohibits a court from authorizing psychotropic drug treatment of an incompetent patient unless the court finds "that the proposed treatment is in the patient's best interests and that no less intrusive alternative is available").

[50]     *See, e.g.*, *Planned Parenthood of the Great Nw. v. State*, 375 P.3d 1122, 1135 (Alaska 2016) ("Suggesting that we somehow answered a question that was not actually asked in [the prior case] is both incorrect and contrary to precedent.  In every case we decide what we decide, and nothing more."); *AAA Valley Gravel, Inc. v. Totaro*, 219 P.3d 153, 167 (Alaska 2009) (agreeing with argument that a statement by trial court was dicta, explaining it was not the litigation's focus and "not binding").

[51]     AS 47.30.837(d)(1)(B).

evidence of that illness, will inform the court's decision on the overarching question of competence to make mental health treatment decisions. This suggests that a court could find a patient lacks competence to make medical treatment decisions based on AS 47.30.837(d)(1)(B) alone.

However "[w]e do not mechanically apply the plain meaning rule but use a sliding scale approach to statutory interpretation, in which '[t]he plainer the statutory language is, the more convincing the evidence of contrary legislative purpose or intent must be.' "[52] Jacob presents no legislative history supporting his reading of the statute, and we found none. Because the statute's application to this case is plain and evidence contradicting a plain reading of the statute is lacking, we conclude that a superior court may find a patient incompetent to make medical treatment decisions based on the lack of a single element in AS 47.30.837(d)(1).

### 3. The superior court's finding that Jacob was not competent to participate in medical decisions is not clearly erroneous.

We now turn to the question whether the superior court complied with the medication order statutes in determining — by clear and convincing evidence[53] — that Jacob lacked competence to participate in medical decisions.

Jacob argues that the superior court found he lacked competence purely because he was not recognizing his mental illness, and that in doing so the court improperly disregarded evidence that he was in fact competent. At the 30-day hearing Dr. Mack testified to the effect of Jacob's inability to recognize his mental illness on his

---

[52] *Huit v. Ashwater Burns, Inc.*, 372 P.3d 904, 912 (Alaska 2016) (second alteration in original) (quoting *Gov't Emps. Ins. Co. v. Graham-Gonzalez*, 107 P.3d 279, 284 (Alaska 2005)).

[53] AS 47.30.839(g); *Wetherhorn v. Alaska Psychiatric Inst.*, 156 P.3d 371, 382 (Alaska 2007).

ability to participate in medical treatment decisions. Jacob was not able to rationally discuss treatment goals or establish a long-term maintenance plan because all discussion attempts ended in him flatly denying his disorder. At the 90-day hearing the court-appointed visitor similarly stated that Jacob's inability to recognize his mental illness prevented him from having a rational discussion about treatment. This testimony supports the court's determination that Jacob was not competent because he did not meet AS 47.30.837(d)(1)(B)'s requirement that he be able to recognize his mental illness to the extent required to make mental health treatment decisions. Accordingly, the superior court's finding is not clearly erroneous.

### 4. The superior court's finding that medication was in Jacob's best interests is not clearly erroneous.

Jacob argues that the superior court's finding that the 30-day medication order was in his best interests was clearly erroneous.[54] Jacob also argues that the court's findings about the *Myers* best interests factors were not sufficiently detailed in either the 30- or 90-day medication order. Those factors are:

> (1) the extent and duration of changes in behavior patterns and mental activity effected by the treatment; (2) the risks of adverse side effects; (3) the experimental nature of the treatment; (4) its acceptance by the medical community of the state; and (5) the extent of intrusion into the patient's body and the pain associated with the treatment.[55]

---

[54]     *Myers*, 138 P.3d at 254 ("[A] court may not permit a treatment facility to administer psychotropic drugs unless the court . . . expressly finds by clear and convincing evidence that the proposed treatment is in the patient's best interests and that no less intrusive alternative is available.").

[55]     *Id.* at 252 (citing *Price v. Shepard*, 239 N.W.2d 905, 913 (Minn. 1976)) (directing courts to "balance [a] patient's need for treatment against the intrusivenes of the prescribed treatment" (quoting *Price*, 239 N.W.2d at 913)).

Dr. Mack's testimony at the 30-day hearing about the proposed medication supports a conclusion under the *Myers* factors that the treatment was in Jacob's best interests: Jacob previously showed great improvement while taking the medication over a short time period; the risk of adverse side effects was low; and the medication was a non-experimental, accepted treatment for delusional disorder. The court's finding that the medication was in Jacob's best interests is not clearly erroneous.

We have previously noted the need for courts to make detailed findings concerning the *Myers* best interests factors or to incorporate the magistrate judge's findings when deciding involuntary medication orders.[56] The superior court considered Jacob's objections to the magistrate judge's recommendation that the 30-day medication order be granted. In response the superior court adopted the magistrate judge's reasoning that Dr. Mack's testimony supported the best interests finding. As noted above this testimony supports the finding that medication was in Jacob's best interests under the *Myers* factors.

The superior court's best interests determination for the 90-day medication order was similarly sparse, with the court pointing to Mannen's testimony as support. The medication requested in the 90-day medication petition was the same medication given under the 30-day medication order. And, similarly to Dr. Mack's testimony at the 30-day medication hearing, Mannen's testimony supported a finding that the medication was in Jacob's best interests. Accordingly, the superior court's best interests finding underpinning the 90-day medication order is not clearly erroneous.

---

[56] *See In re Gabriel C.*, 324 P.3d 835, 840 (Alaska 2014).

Although we affirm the superior court's medication decisions, we again emphasize the need for detailed findings when making best-interests decisions.[57]

## V.   CONCLUSION

We AFFIRM the superior court's commitment and medication orders.

---

[57]   *See id.*