NOTICE

*Memorandum decisions of this court do not create legal precedent. A party wishing to cite such a decision in a brief or at oral argument should review Alaska Appellate Rule 214(d).*

THE SUPREME COURT OF THE STATE OF ALASKA

| | |
|---|---|
| In the Matter of the Necessity for the Hospitalization of | ) ) ) Supreme Court No. S-17148 |
| MARGO T. | ) ) Superior Court No. 3AN-18-01369 PR |
| | ) ) MEMORANDUM OPINION ) AND JUDGMENT* ) |
| | ) No. 1754 – February 5, 2020 |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Pamela Scott Washington, Judge pro tem.

Appearances: Douglas O. Moody, Deputy Public Defender, and Quinlan Steiner, Public Defender, Anchorage, for Margo T. Katherine Demarest, Assistant Attorney General, Anchorage, and Kevin G. Clarkson, Attorney General, Juneau, for State of Alaska.

Before: Bolger, Chief Justice, Winfree, Stowers, Maassen, and Carney, Justices.

I.      INTRODUCTION

A patient appeals the superior court's 30-day involuntary commitment order, arguing that the court lacked sufficient evidence to find she was gravely disabled. We conclude that there was no clear error in the superior court's findings and affirm the commitment order.

---

\*      Entered under Alaska Appellate Rule 214.

## II. FACTS AND PROCEEDINGS

### A. Facts Leading To 30-Day Involuntary Commitment Hearing

At the time of the relevant proceedings Margo T.[1] was a 59-year-old woman who had 19 previous Alaska Psychiatric Institute (API) admissions.

In May 2018 Margo appeared in court for a 30-day involuntary commitment hearing. It is undisputed that the superior court ultimately denied the petition.[2] Margo was discharged from API the next day, and that afternoon she was transported to the courthouse to attend an unrelated hearing. Margo's public defender then sought to have her hospitalized for a psychiatric evaluation.[3] The attorney stated that Margo had been discharged from API only hours before but that she was "not oriented to time [and] place, [had] no coherent thoughts, [and was] very confused." The attorney believed Margo was gravely disabled because she was wheelchair-bound; needed considerable assistance using facilities; had her medications in a large sack but could not read the labels; and complained of hunger and a need for oxygen.

In response to the petition, a magistrate judge recommended hospitalizing Margo for evaluation. The magistrate judge indicated that probable cause existed to believe Margo was gravely disabled because "none of the [Coordinated Resources

---

[1] We use a pseudonym to protect the respondent's privacy.

[2] Margo apparently first was evaluated at API, because a discharge summary is in the record. The parties also notified the superior court during the commitment hearing that Margo had been released from API after the court denied a prior 30-day commitment petition. The denied petition and transcript of the related commitment hearing are not in the record.

[3] *See* AS 47.30.700 (providing that "any adult" may file a petition seeking another individual's involuntary hospitalization and establishing procedures).

Project[4]] personnel could meaningfully communicate with her" and she was "not capable of taking care of her own activities of daily living even at the [emergency homeless] [s]helter." The superior court adopted the recommendation and authorized Margo's evaluation hospitalization;[5] she was returned to API.

Two API mental health professionals petitioned the next day for Margo's 30-day involuntary commitment.[6] Reiterating the court's evaluation order regarding Margo's inability to meaningfully communicate or care for her daily needs, the staff members further alleged that she "suffer[ed] from an acute episodic exacerbation of bipolar disorder" and that she had a low frustration tolerance and "poor impulse control." The staff members concluded Margo had poor insight into her illness and was unable to participate in discharge planning, had impaired judgment, and suffered from "non-reality based thinking," putting her at risk for further deterioration. A magistrate judge held a commitment hearing that same day.[7]

---

[4] Anchorage's Coordinated Resources Project "is a voluntary 'therapeutic' or 'problem-solving' court . . . that hears cases involving individuals with mental disabilities who are charged with criminal offenses." ALASKA COURT SYS., ANCHORAGE COORDINATED RESOURCES PROJECT (Aug. 2019), https://public.courts. alaska.gov/web/forms/docs/pub-100.pdf.

[5] *See* AS 47.30.700(a) (regarding ex parte order authorizing respondent's hospitalization for evaluation based on probable cause to believe respondent is mentally ill and, as a result, is gravely disabled or likely to cause harm to self or others).

[6] *See* AS 47.30.730(a) (establishing 30-day involuntary commitment petition requirements when respondent is under 72-hour evaluation at treatment facility).

[7] *See* AS 47.30.735 (establishing 30-day involuntary commitment hearing procedures); AS 47.30.715 (requiring court to schedule 30-day commitment hearing within 72 hours after respondent's arrival at evaluation facility).

**B.  30-Day Commitment Hearing**

The State called only one witness at the commitment hearing, an API physician's assistant who was qualified as an expert without objection. She testified that she was Margo's psychiatric care provider and had seen Margo intermittently over her past three admissions. The physician's assistant diagnosed Margo with bipolar disorder, based on her presentation during previous and current admissions as "very grandiose" and "hyperverbal," with disorganized thinking, hostility, unstable mood, and aggression toward other people. The physician's assistant testified that Margo said she was rich and "wants to be referred to as Mrs. President Trump." The physician's assistant believed that Margo was gravely disabled because of "very unpredictable" behavior, disorganized thinking, poor insight into her mental illness, and inability to meaningfully converse with her treatment team.

The physician's assistant also testified that Margo had been discharged from API two days prior. Only hours later Margo was returned to API for evaluation regarding the current mental health allegations. The physician's assistant believed that in the two days since Margo's discharge she had deteriorated; she had become more agitated, disorganized, and guarded. The physician's assistant testified that during Margo's most recent API admission, Margo had refused to speak to her. The physician's assistant did not believe that Margo could meet her treatment needs on an outpatient basis because her disorganization would make her non-compliant with her treatment plan. The physician's assistant believed that with time in a structured environment, Margo would improve enough to participate in discharge planning.

On cross-examination the physician's assistant testified that Margo had no current discharge plan because she refused to engage regarding her treatment. The physician's assistant further acknowledged observing no progress in Margo's symptoms during her two-day stay at API.

Margo then testified on her own behalf; she mumbled through much of her testimony, and her narration of events was at times haphazard and unclear. Margo testified that she had been beaten, kidnaped, and held for ransom, apparently in connection with a federal court program in 1991. Margo testified that she felt her equal rights were violated because "they" provided smoking passes to murderers and "hard core people" but not to her.

Margo's responses became clearer when she was examined by her counsel; she testified that she could live on her own and that she would not harm anyone unless "they hit [her] first." Margo further testified that she could take care of herself and eat properly but that she could not bathe herself without help. Margo's counsel followed up by asking if Margo knew how to travel to receive personal services. Margo's response is indiscernible in both the hearing transcript and audio. Margo's counsel asked if a guardian recently was appointed for her, to which she responded: "They can't do that, I'm on welfare." Margo explained that she had money saved away that could not be touched. When counsel asked if there was anything else Margo wanted the court to know, she testified:

> I've been on every reservation on this country filming. Film. I've been filming with John Wayne from the beginning of Mammoth Mountain, I started filming in OJ Simpson.
>
> I know OJ Simpson and Nicole Brown Simpson and Nicole Kidman. And I went down [indiscernible] confidential. I was in the witness protection program. And I was, like, down — OJ came down. I should have that beach house by now. And they let OJ back out and he beat me up again. He's right here.

### C. Superior Court Findings And Order; Appeal

The magistrate judge made oral and written proposed findings, which the superior court adopted in its 30-day commitment order. The court found that the

physician's assistant had diagnosed Margo with bipolar disorder, consistent with her behavior and speech at the hearing. The court noted that Margo had 19 previous API admissions and "is easily frustrated and lacks impulse control." Based on the physician's assistant's testimony, the court found that "it looks like [Margo] cannot be safely released into the community and she cannot take care of herself without assistance." The court noted that Margo was "generally homeless and vulnerable" and ultimately found that she was gravely disabled. The court later ordered the administration of psychotropic medications. Margo appeals the involuntary commitment order.

## III. STANDARD OF REVIEW

We review factual findings in an involuntary commitment proceeding for clear error, reversing "only if we have a 'definite and firm conviction that a mistake has been made.' "[8] But we decide de novo whether involuntary commitment findings meet statutory requirements.[9]

## IV. DISCUSSION

Margo argues that the State did not produce clear and convincing evidence that she was gravely disabled, specifically noting that earlier in the week the superior court had found she was not gravely disabled and that the State should have demonstrated the extent of her decompensation since that commitment hearing. Margo contends that because she refused to speak to the physician's assistant during the most recent admission, the physician's assistant could not properly assess her. Margo contends that the court instead should have given more weight to her testimony about her ability to live on her own. The State responds that the evidence amply supports the

---

[8] *In re Hospitalization of Linda M.*, 440 P.3d 168, 171 (Alaska 2019) (quoting *In re Hospitalization of Jacob S.*, 384 P.3d 758, 764 (Alaska 2016)).

[9] *Id.* (quoting *In re Jacob S.*, 384 P.3d at 764).

court's finding that Margo was gravely disabled and that she is improperly asking us to reweigh the evidence.

Before involuntarily committing a person, the superior court must find by clear and convincing evidence that the person is "mentally ill and as a result is likely to cause harm to [self] or others or is gravely disabled."[10] Gravely disabled is defined, in relevant part, by AS 47.30.915(9):

> "[G]ravely disabled" means a condition in which a person as a result of mental illness
>
> . . . .
>
> (B) will, if not treated, suffer or continue to suffer severe and abnormal mental, emotional, or physical distress, and this distress is associated with significant impairment of judgment, reason, or behavior causing a substantial deterioration of the person's previous ability to function independently.[11]

Distress justifying commitment under subsection (B) "refers to a level of incapacity that prevents the person in question from being able to live safely outside of a controlled environment."[12]

Hours after Margo's earlier discharge from API, her attorney expressed concern that she was at risk of serious physical harm and sought an involuntary

---

[10] AS 47.30.735(c).

[11] The superior court did not specify whether it found Margo gravely disabled under subsection (A) or (B) of AS 47.30.915(9). We review the court's gravely disabled finding under subsection (B) based upon the testimony and arguments presented during the commitment hearing. But we note that it is better practice for the court to specify in its gravely disabled finding whether its finding is under subsection (A) or (B) or both.

[12] *Wetherhorn v. Alaska Psychiatric Inst.*, 156 P.3d 371, 378 (Alaska 2007), *overruled in part on other grounds by In re Hospitalization of Naomi B.*, 435 P.3d 918 (Alaska 2019).

evaluation because she was wheelchair-bound, homeless, and confused; could not read the labels on her medication; and complained of hunger and a lack of oxygen. The API physician's assistant who treated Margo testified at the commitment hearing that Margo had "poor insight into her mental illness," refused to talk to API staff, and was "agitated." The physician's assistant further testified that Margo would not be compliant with an outpatient program because of her disorganized thinking. The court noted that Margo's speech and behavior at the commitment hearing were "consistent with [her] diagnosis" and that she was "easily frustrated," "lack[ed] impulse control," and "homeless and vulnerable." Evidence before the court therefore showed that Margo's mental illness was severely impacting her ability to function outside of a controlled environment.

Margo argues that because she refused to speak to her treating physician's assistant, the physician's assistant could not adequately assess her decompensation level. The physician's assistant testified, however, that she had treated Margo on two previous occasions and noticed that on this admission Margo was more agitated, more disorganized, and less cooperative with API staff. The superior court therefore could conclude that the physician's assistant had a basis for her testimony about Margo's decompensation since the previous commitment hearing.

Moreover, the State was not necessarily required to prove Margo's decompensation level since her previous commitment hearing. In *In re Hospitalization of Tracy C.* we determined that "a commitment order must be based on the patient's condition at the time of the commitment hearing."[13] And in *In re Hospitalization of Jeffrey E.*, which Margo discusses in her brief, we concluded that because the statutory definition of gravely disabled under subsection (B) is forward-looking, an individual can

---

[13]   249 P.3d 1085, 1092 (Alaska 2011).

be gravely disabled at the time of a commitment hearing even if not suffering from distress at the exact time of the hearing.[14]

The evidence demonstrated that Margo was suffering from distress at the time of the hearing. The superior court found Margo presented as gravely disabled; she was "easily frustrated," "lack[ed] impulse control," and "not now capable of caring for herself and [could not] meet her fundamental needs without assistance." The court noted that Margo's speech and behavior during the commitment hearing supported its finding. Margo provided clear answers to her attorney's direct questions about her ability to live safely outside a controlled environment. But when asked what she wanted the court to consider, Margo demonstrated disorganized and delusional thinking. Margo's testimony meandered as she mentioned being beaten, kidnaped and held for ransom in connection with a government program, starring in films with John Wayne, and associating with other actors. Irrespective of the earlier decision that week, the superior court was required to find whether Margo was gravely disabled at the time of the hearing in accordance with the involuntary commitment statute. Margo's presentation at the hearing, along with the physician's assistant's testimony, support the superior court's finding that Margo was gravely disabled at that time.

Lastly, Margo asks us to reweigh the evidence in her favor based on her more rational testimony about her ability to live safely in the community. When the superior court issues findings after weighing the credibility of witnesses and conflicting oral testimony, we will grant "especially great deference" to the court.[15] Margo's answers indicating that she could live safely on her own in the community were contradicted by her other testimony. The court weighed Margo's testimony as

---

[14]    281 P.3d 84, 88 (Alaska 2012).

[15]    *Bigley v. Alaska Psychiatric Inst.*, 208 P.3d 168, 178 (Alaska 2009).

supporting a finding that she was gravely disabled. It is not our function to reweigh evidence if the record supports the court's finding.[16] The court's finding that Margo was gravely disabled properly focused on her condition at the time of the hearing and was not clearly erroneous.

## V.  CONCLUSION

We AFFIRM the superior court's involuntary commitment order.

---

[16]  *In re Hospitalization of Jacob S.*, 384 P.3d 758, 766 (Alaska 2016).